Whitaker, Judge,
delivered the opinion of the court:
On February 26,1941, the Government entered into a contract with plaintiff for the purchase of a “stabilizing platform in accordance with Dr. Erwin J. Saxl specification dated 12-12-40” for the sum of $22,000.00. The platform was delivered to the defendant in February 1942, but was rejected on the ground that it did not comply with the specifications. The Government had advanced to plaintiff $6,600 to defray in part the cost of the construction of the platform. Plaintiff sues for the difference.
The Government has filed a counterclaim for the $6,600 on the theory that plaintiff did not comply with his contract and, therefore, that the payment to him of the $6,600 was without consideration.
In order to properly interpret the provisions of the contract, which are not clear, it is necessary to consider the events leading up to its execution.
Normally, a bomb sight is mounted on a platform, which is kept absolutely stable by a gyroscope. In the manufacture of these gyroscopes, however, there are required materials and highly skilled labor, which in 1940 were becoming increasingly scarce. Therefore, the Air Force tried to develop some substitute for the gyroscope. It was also interested in the development of bomb sights. Some time in September 1940 Doctor Saxl went to Wright Field and talked with Colonel (then Major) Kilpatrick about the development of bomb sights and stabilizing platforms.
Doctor Saxl, the only witness as to what took place at this conference, says that Colonel Kilpatrick said to him: “Well, Doc, how about using your inventive abilities towards licking this bottleneck on bomb sights and stabilizing platforms for us.” He said, “It struck me like lightning there Were ways of doing it. In the office of Kilpatrick I sketched out this page, with essential descriptions, the early concept *78 and the means of stabilizing later on incorporated in my construction.” (Tr. 14.) This of course was a very rough sketch. It is plaintiff’s exhibit 5.
Colonel Kilpatrick was interested in the idea and took plaintiff to the legal department of the Air Force where some specifications and a letter were written by plaintiff offering to construct an instrument along the lines of the specifications. Defendant expressed interest in plaintiff’s proposal, but it was neither accepted nor rejected.
Plaintiff returned to his home in Providence, Rhode Island, and on his own initiative went to work on developing his idea. He constructed a model embodying the basic idea of his invention and asked representatives of the Air Force to come down and look it over. Two representatives finally came, a Mr. Goll and a Captain Murtha. These gentlemen spent two days at plaintiff’s shop examining and testing his model and questioning plaintiff about his education, experience, finances, etc.
At the conclusion of their visit Mr. Goll dictated to plaintiff’s secretary specifications for the manufacture of this platform, which specifications are referred to and made a part of the contract subsequently entered'into. These specifications referred to two drawings of the instrument: one of a part of the instrument, and the other of the entire instrument, designated C-2 and C-8. These drawings were prepared by plaintiff. This was on December 12,1940. On February 10, 1941, after intervening correspondence and telephone calls, defendant mailed to plaintiff its invitation for bid, which was accepted by plaintiff on February 17, and accepted by the Government on February 26.
What the Government bought and what the plaintiff sold was a “stabilizing platform in accordance with Dr. Erwin J. Saxl specification dated 12-12-40.” Plaintiff says the instrument he constructed and delivered to Wright Field was constructed in accordance with these drawings and specifications. The defendant' says that it was not constructed in accordance with, them, for the primary reason that plaintiff’s device was an automatic, leveler and not a stabilizing platform. It says that in-plaintiff’s instrument the platform upon which the bomb sight was supposed to rest did not re *79 main stable but veered from position with the change of direction or level or speed of the airplane, and, then, after an interval, returned to its former position, or within a degree or so of its former position. It says that such an instrument is an automatic leveling device, and not a stabilizing platform, which it wanted.
The defendant’s position may be summed up in the following paragraph from the memorandum prepared by Major Dickson, then Master Sergeant Dickson, following tests of the instrument made by him and Sergeant Hamilton in the bomb chamber at Wright Field. His first conclusion is:
1. That subject device does not comply with the specifications as drawn up for the contract as follows:
a. Stabilization is not produced to within ± 1°. This is evident since any displacement of the base produces an equal displacement of the platform. Stability is the strength to stand without being moved or overthrown. It is the state of maintaining a uniform level, both horizontal and vertical, so that no tipping or front or rear pitching occurs. The fact that the platform is caused to return approximately to the level position after an elapse of considerable time, and the fact that movement of the base is translated into an equal movement of the platform, remove this device from the stabilizer category and establish it as an automatic leveling device of questionable accuracy.
This is the main defense relied upon by the defendant in its brief.
Plaintiff, on the other hand, says that the drawings and specifications did not call for a platform that should remain in the same plane at all times, but, rather, one that should be returned, within a certain tolerance, to its former plane after displacement.
This is the first issue to be determined.
From a reading of the specifications, at first at least, one is inclined to say that the defendant is right. Under the heading of “General Description” the specifications provide in part:
This specification covers a stabilized platform for use within' airplanes. This platform may be used for the purpose of mounting a bomb sight, or an artificial horizon for navigation purposes. .
*80 Under the beading of “Operation”, after providing for activating tbe relays in the instrument, it says:
* * * The relays shall control the motion of such mechanical equipment so as to maintain the platform in a standard stabilized* position. [Italics ours.]
Then, under “Operation Requirements” it is provided:
This device shall stabilize a mass of not to exceed 25 pounds put upon this platform. * * *
* * * * *
The accuracy to be accomplished by this means of stabilization shall be within two degrees.
All of this would seem to indicate the parties had in mind a stabilizing device and not an automatic leveling device. We come naturally to this conclusion also when we recall that what the Army was after was an instrument to take the place of a gyroscope, which, as is well known, remains absolutely stable, independent of any motion of its base.
However, under the heading of “General Description,” a part of which we quoted above, after describing in a general way the instrument to be constructed, it is said:
By its use the direction of the electric current is controlled in such a manner that suitable auxiliary equipment retwrns the stabilizing platform to the normal reference plane.
This sentence negatives the idea of the platform remaining in its normal plane. It speaks of retwrning the platform to its normal plane. It could not return it to its normal plane unless the platform had deviated therefrom. Although the word “stabilized” is used throughout the specifications, this sentence would indicate that what the parties had in mind was not a stabilizer, but an automatic leveler.
When we look at drawing C-3 attached to the specifications and referred to therein, and reproduced in Finding 7, we see that of necessity the parties did have in mind retwm-ing the platform to position rather than Tceeping it in position.
In the first place, it will be noted that the piston in the cylinder “P” is pushed upward by the injection of a liquid into the cylinder. This raises the platform “T”, upon which *81 the bomb sight rests, to approximately its former position. There would be 110 use in the piston “P” pushing the platform “T” upward unless it had been deflected downward. If it had remained in its normal plane, there would be no use for piston “P”.
Again. The mechanism is operated by a beam of light from the light bulb “L” which strikes the mirror and is reflected against one of the photo-electric cells,- either P-1 or P-2. When the platform is in level position the light from the bulb “L” strikes neither of the two photo-electric cells, but goes directly between them. The mechanism is not put in operation until this ray of light is deviated to the right or left and strikes one of the two photo-electric cells. This deviation is caused by displacement of platform “T”.
Defendant’s defense that the plaintiff’s instrument did not comply with the specifications because it was not a stabilizing platform, but rather an automatic leveler, therefore fails. The specifications called for an automatic leveler.
The next question is whether or not the instrument furnished by plaintiff complied with the specifications, construing those specifications as calling for an automatic leveler.
It might be here interpolated that it makes no difference whether a platform, which was displaced by the movement of the plane, although promptly returned to its former position, would be any good for the mounting of a bomb sight. If this is what the defendant ordered, and if the plaintiff manufactured what the defendant ordered, the defendant is due to pay for it, whether it would serve the purpose or not. The Commissioner who heard this testimony expressed it rather succinctly as follows:
I will sustain the objection to that. As I see it, Mr. Tolley, the Government ordered something, and it would not make any difference whether it was of any value to them or not.
Major Dickson in his testimony says that it physically complied with the specifications. The contract, however, says, “Functional tests shall be the basis for acceptance by the Government.” That means, of course, it must perform the function expected of it, and this means, it must return the platform to its former position within the permitted *82 tolerance. That permitted tolerance is set out in the specifications under “Operation Requirements”. In paragraph B thereunder it is said: “The accuracy to be accomplished by this means of stabilization shall be within two degrees.” In other words, then, our inquiry is whether or not the instrument returned the platform to its former position within a tolerance of two degrees.
As stated before, Master Sergeant Dickson and Sergeant Hamilton, under the supervision of Colonel Kilpatrick, made exhaustive ground tests of this instrument. Their report shows that in every test to which it was subjected, except one, the platform was returned to its former level position, or to within from .25 of a degree to 1.2 degrees of its formér position. In only one instance did it fail to return to within 2 degrees of its former position.
It thus substantially complied with the provisions of the specifications.
Defendant, however, complains that it took an excessive length of time for it to return to its approximate former position. The memorandum referred to above shows that it did take from 15 seconds to 20 seconds for it to return to its approximate former position. This was a serious defect, of course, but nothing whatever was said in the specifications as to the length of time which should elapse before the platform should return to its former position. This defect was not too difficult of correction, anyway. Defendant, therefore, has no ground for complaint on this score.
In the third paragraph of his memorandum Master Sergeant Dickson said:
The system described above is basically sound provided that it is not subjected to the forces of acceleration and vibration. The device is poorly designed and manufactured and it is worthless as an aircraft instrument where these forces are always present. In fact, a slight transverse vibration of the platform renders the leveling mechanism inoperable.
In the last test Sergeants Dickson and Hamilton made of the plane it “was shaken very gently” with the following result: “Action of both leveling assemblies was produced which caused the platform to be displaced from level in *83 both planes of from .5 degree to 1.5 degrees.” This is what vibration did to it. Furthermore, according to Docttir Saxl’s testimony:
After I had plugged in the stabilizing.platform and had proved to Sergeants it was in accordance with purchase specifications, Colonel Kilpatrick came in, looked at it, picked it up on side, shook it, said, No Good, and walked out.
There is but little doubt from a reading of the entire record that acceleration and vibration of the plane rendered the instrument practically worthless.
It is not specifically provided that plaintiff should take steps to see that his instrument is protected against the forces of acceleration, deceleration, and vibration, but it is evident that this was in the contemplation of the parties. Section D of the specifications reads:
The Government shall provide vibration patterns for the models of airplanes m which this model is to be tested, and the data covering the acceleration to which these airplanes will be submitted in actual flight.
Plaintiff knew that this was part of his contract because he undertook to take care of these forces, and claims he did so. He complains that defendant was slow in furnishing the data and he says it was inadequate, but he nowhere claims that it was not a part of his job to offset these forces.
It was necessarily a part of the contract between the parties that plaintiff’s instrument should be designed so. that it would not be affected by these forces. There is no question but that it was affected by these forces, and affected to such an extent that, to use Major Dickson’s language, it was “worthless as an aircraft instrument.”
Defendant’s officers, therefore, were justified in declaring plaintiff in default. On March 13, 1942, Colonel Carroll, Chief, Experimental Engineering Section, Wright Field, wrote the Chief of the Contract Section, in which he said:
3. Upon inspection it was found that the device submitted in nowise meets the requirements of the specifications, and the quality of workmanship is inferior to the point indicating total lack of knowledge upon the part of the manufacturer concerning the standards of instrument manufacture.
*84 4. From circumstances pertaining to delivery, quality of manufacture and general design arrangement, it is evident that Dr. Saxl will be unable to complete' his contract. It is, therefore, recommended that action be taken to accomplish its cancellation.
Accordingly, defendant’s contracting officer, on June 1,1942, wrote plaintiff in part as follows:
Reference is made to the subject contract calling for a stabilizing platform, upon which complete and satisfactory delivery has not been made to date. Upon investigation, it was found that the quality of workmanship on this article is inferior to the point indicating total lack of knowledge concerning the standards of instrument manufacture on your part. In view of the fact that you are unable to complete this contract you are declared in default.
Defendant was justified in writing these letters because plaintiff had failed to take care of the forces of acceleration and vibration. However, the instrument was thoroughly impractical anyway. Any platform, which deviated from the plane in which it was set coincident with the movement of the airplane, could not be a satisfactory platform upon which a bomb sight was to be mounted, even though the platform returned to position quickly. It would be extremely difficult for a man to shoot a duck if somebody was constantly deflecting his gun, although deflected only for a second.
We are satisfied defendant’s officers became convinced of this after examining the instrument manufactured by plaintiff.
Furthermore, it would seem obvious that any instrument which depended for its success upon the stability of a mirror floating in mercury, as this one did, must of necessity be so affected by the forces of acceleration and vibration as to be useless in an airplane. Erratic behavior on the part of the mercury and, hence, of the mirror, necessarily interfered with the proper operation of the instrument, and vibration and acceleration necessarily created erratic behavior. It would seem that the difficulty of stabilizing so unstable a thing as mercury when it was subjected to the constant vibration of an airplane, and to the sudden great increases in speed of a plane, as, for instance, when it makes a dive — it *85 would seem that these difficulties would be difficult indeed to overcome.
Defendant seems to have learned this from the testing of plaintiff’s instrument. It would seem that defendant should have known this in the beginning, but they nevertheless engaged plaintiff to go ahead and manufacture the instrument, although it seemed probable that it would turn, out to be useless. Plaintiff did so in good faith, and in the doing of it incurred expenses of $11,264.28.
While defendant never used plaintiff’s product, and no doubt will never use the idea behind it, nevertheless, it has received the benefit of having had demonstrated to it the unworkability of this idea. Since it encouraged plaintiff to spend his money in the construction of this instrument and since plaintiff constructed it to the best of his ability, as nearly in accord with the specifications as could be done, and defendant has received some benefit therefrom, we think it would be highly inequitable to allow recovery on defendant’s counterclaim for money advanced plaintiff to do this work. Having received a substantial benefit from plaintiff’s labors, we think defendant is not entitled to recover the amount which it advanced to plaintiff. Cf. Dermott v. Jones, 23 Howard, 220, 233.
Coleman v. United States, 152 U. S. 96; Ingle v. Jones, 69 U. S. 1, 17 L. Ed. 762; J. L. Robinson Construction Co. v. Barry, 135 Md. 275, 108 A. 688; Bluthenthal & Bichart v. May Advertising Company, 127 Md. 277, 96 A. 434; Feeney v. Bardsley, 66 N. J. L. 239, 49 A. 443; Lawton v. Newport Industrial Co., 44 R. I. 91, 115 A. 645; Williston on Contracts (1937 Ed.), sec. 1475, and cases cited in note 2.
Plaintiff’s petition and defendant’s counterclaim are both dismissed.
Howell, Judge; Madden, Judge; Littleton, Judge; and Jones, Chief Judge, concur.