**OWENS–CORNING FIBERGLAS COR-PORATION** and **Polytron Company, By and Through Walsh Construction Company**

v.

**The UNITED STATES.**

No. 301–66.

United States Court of Claims.

Dec. 12, 1969.

See also Ct.Cl., 412 F.2d 1277.

Walter F. Pettit, San Francisco, Cal., attorney of record, for plaintiff. Harold C. Nachtrieb, Thomas W. Kemp, Allan J. Joseph and Miller, Groezinger, Pettit, Evers & Martin, San Francisco, Cal., of counsel.

Lawrence S. Smith, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner Louis Spector with directions to prepare and file an opinion on the issues of plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment under the order of reference and Rule 99(c) [since September 1, 1969, Rule 166(c)]. The commissioner has done so in an opinion and

report filed on April 21, 1969, wherein such facts as are necessary to the opinion are set forth. On November 4, 1969, defendant filed with the court defendant's notice that it does not intend to request review of the commissioner's report. On November 14, 1969, plaintiff filed a motion that the court adopt the opinion of the commissioner which was filed April 21, 1969. The case has been submitted to the court on the briefs of the parties without oral argument. Since the court agrees with the opinion and recommended conclusion of the trial commissioner, it hereby adopts the same as the basis for its judgment in this case as hereinafter set forth. Therefore, plaintiff's motion for summary judgment is granted, defendant's cross-motion is denied and judgment is entered for plaintiff in accordance with the opinion. Further proceedings are stayed pursuant to Rule 167 [prior to September 1, 1969, Rule 100] for a period of ninety (90) days to afford the parties an opportunity to obtain an administrative resolution by the agency of the equitable adjustment to which plaintiff is entitled.

## OPINION OF COMMISSIONER

SPECTOR, Commissioner:

This case grows out of a unique contract between plaintiff Walsh Construction Company and the Atomic Energy Commission. The purpose of the contract is not fully revealed by the record because it called for the construction of an environment for tests, and the details concerning the tests were classified. As a result, plaintiff was not fully apprised of the purpose to which this construction was to be put, a fact which has an important bearing on the principal issue presented, namely, the proper interpretation to be placed upon defendant's specification.

Other issues are presented by the caption of this case, Owens-Corning and Polytron being first and second-tier subcontractors of the plaintiff prime contractor, Walsh. They were the subcontractors directly concerned with performing the segment of work out of which the dispute arose, and they are described in the caption as acting "by and through Walsh Construction Company." Defendant asserts that they are "not proper plaintiffs," and also that Walsh's right to recover is barred by the so-called *Severin* doctrine.[1]

### General Statement of Facts

On October 15, 1959, the Atomic Energy Commission (hereinafter referred to as AEC), invited proposals for a fixed-price construction contract in furtherance of an operation designated as the Structural Response Program. The test site is at Mercury, Nevada. Walsh was awarded a contract dated November 4, 1959, in the amount of $1,131,828, described as construction of "a shaft, tunnels, and drifts and other related work."

The work consisted of construction of a perpendicular mine-like shaft approximately 800 feet deep, with tunnels and drifts running out from the main shaft. A drawing furnished as Appendix A to the hearing examiner's opinion on appeal, shows that these lateral tunnels and drifts were divided into about 20 sections or compartments which were to be lined with various structural materials (steel, corrugated metal, concrete). Polyurethane (a type of plastic foam) was to be installed between the material to be tested and the jagged rock surface of the excavated tunnel or drift. The polyurethane was apparently to act as a shock absorber, since another shaft was to be sunk at a specified distance from the one above described, and the AEC planned to detonate therein either a nuclear or conventional explosive. In this

1. Severin v. United States, 99 Ct.Cl. 435 (1943), cert. denied, 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944); Continental Ill. Nat'l Bank & Trust Co. v. United States, 115 F.Supp. 892, 126 Ct. Cl. 631 (1953); Continental Ill. Nat'l Bank & Trust Co. v. United States, 101 F.Supp. 755, 121 Ct.Cl. 203, cert. denied, 343 U.S. 963, 72 S.Ct. 1057, 96 L.Ed. 1361 (1952); Continental Ill. Nat'l Bank & Trust Co. v. United States, 81 F.Supp. 596, 112 Ct.Cl. 563 (1949).

way the agency intended to test the effect of the blast on the various structural materials lining the compartments in the original shaft.

Work was to be completed within 150 days, that is, by April 3, 1960. With respect to that part of the work relating to placement of the polyurethane, Walsh entered into a subcontract on January 19, 1960, in the approximate amount of $125,000, with the Fiberglas and Engineering Supply Division (hereinafter referred to as Fenco) of the Owens-Corning Fiberglas Corporation for the placement of the polyurethane. The subcontract incorporated by reference various clauses of the prime contract including the "Disputes" and "Changes" clauses. Thereafter Fenco, in February 1960, entered into two purchase orders totaling $100,000 with the Polytron Corporation (a subsidiary of Pacific Vegetable Oil Company), for the purchase of the polyurethane material and a machine suitable for its mixing and application. Mr. Jennings, President of Polytron, is an expert in the field of polyurethane.

Specification section 5–03 sets forth the requirements for the polyurethane, as follows:

### 5–03  PLASTIC FOAM

The plastic foam used for backpacking shall be polyurethane foam similar to that manufactured by Union Carbide Chemical Company. The foam shall be formed in place by mixing liquid reactants as furnished by the Manufacturer and in accordance with the latter's recommendation. The reactants shall combine completely during the foaming step known as the "one-shot" process. The foam shall have a density of 6 lbs. per cubic foot with the following specified properties:

|  | Parallel to foaming direction | Perpendicular to foaming direction |
|---|---|---|
| Yield stress (psi) | 170 | 120 |
| Modulus of elasticity (psi) | 6800 | 3600 |

No load shall be imposed on the foam and the form shall be left in place until the foam has attained a strength equal to half of the specified yield strength as manifested by a sample piece. To avoid damaging the foam during stripping of the form, a plastic membrane shall be used to line the form prior to foaming. After the form is removed, the membrance shall be left in place. The foam shall be used as the outside form for the concrete lining.

Testing of the foam is governed by provision SC–25 entitled "Furnishing of Samples of Materials," as follows:

a.   To permit laboratory analysis and testing of materials used in the test sections of the drifts, test samples shall be prepared packaged and shipped f.o.b. Urbana, Illinois.

\*      \*      \*      \*      \*      \*      \*      \*      \*

8.   Foam—Five (5) one foot cubes of plastic foam from each 15 ft. tunnel section shall be provided. These cubes may be poured into corrugated paper boxes or similar containers. Each cube is to be marked appropriately to identify the tunnel section for which it was poured.

Polyurethane foam is formed by the reaction of certain basic chemicals, and the use of a catalyst to speed the reaction. A blowing agent such as freon or carbon dioxide is used to froth up the volume. In the "one-shot" process referred to in specification 5–03 above, all the chemicals are mixed at one time. The chemical liquids in separate drums are forced through hoses into a mixing chamber where the reaction occurs. Within 2 or 3 hours, the resultant plastic hardens to about 80 percent of its maximum strength, and the maximum is achieved in about five days. This "one-shot" process is in contrast to the prepolymer process in which certain of the ingredients are premixed.

The "one-shot" process referred to in the specifications was abandoned from the outset because the phrase "in place," also used by the draftsman of specification 5–03, was inconsistent therewith. These words meant that the chemical ingredients were to be pressured into the voids between the rock walls of the tunnels and the tunnel linings to be tested, while the reaction was taking place. The advantage of forming in place was that the materials were still fluid and expanding, and would thus tend to fill the irregularities in the rock and provide a tighter seal.

Walsh dug the main shaft and the required tunnels, drifts and testing sections. In March and April 1960, Polytron built the necessary machine and it was lowered into the shaft in the first part of May. Long runs of hoses were installed from it to the various sections to be backpacked with polyurethane, and thereafter under the direct supervision of the company president, Mr. Jennings, four of the 20 sections were backpacked.

Prior to the periods here involved, polyurethane meeting the minimum requirements of these specifications with respect to density, yield strength and modulus of elasticity had been manufactured under controlled conditions in laboratories and factories. Also, the "in place" method had been tried in some applications but never on the scale and under the field conditions presented by this project involving as it did tunnels 800 feet underground, irregular cavities, relatively long runs of hose, and temperature problems.

The first four sections were tested and rejected by Holmes & Narver, architect-engineers (AE) retained for the project by the AEC. The AE rejected the polyurethane on the grounds that defendant interpreted specification 5–03 as providing *exact* numerical requirements without any permissible tolerance whatever. In other words, it was defendant's interpretation that the polyurethane could not be one bit harder, nor softer, than the values recited in section 5–03. Thereafter the AE stated that it would allow a tolerance of ±10%, but Polytron, which had construed the specifications as setting forth *minimum* requirements, concluded that it was literally impossible to meet the specifications in an "in place" operation if interpreted to require precise values, or precise values with a tolerance of ±10%, and it withdrew from the project. The material placed by Polytron was ordered removed.

Fenco then entered into a second-tier subcontract with American Latex Products (hereinafter referred to as Latex), to perform this phase of the work. Latex could point to recent experience with polyurethane using a machine of its own, and it tried to meet the specifications, as interpreted to require precise values, but with a tolerance of ±10%. It also failed, and advised all concerned that as interpreted the specifications were impossible of attainment in an "in place" operation under the conditions presented.

On July 15, 1960, a conference was held, attended by the AEC, its AE, Fenco, the prime contractor Walsh, and others. The specifications were reworked and the contract formally amended to provide as follows:

5–03 *PLASTIC FOAM*

Scope—This section of the Specifications establishes the requirements for

the foam backpack which shall be a foamed-in-place polyurethane foam.

\*  \*  \*  \*  \*  \*

3. *Physical Properties*

The polyurethane foam shall be sufficiently consistent in properties so that the test specimens prepared from cored samples of in-place foam shall meet the following requirements:

a. Yield stress in the direction parallel to the rise of in-place foam shall be 170 psi with an allowable tolerance of plus 10% or minus 20%.

b. Yield stress in the direction perpendicular to the rise of in-place foam shall not be greater than that allowed in the parallel direction, but in no case less than 112 psi.

c. At least 75% of the cored samples of in-place foam obtained from each 15-foot test section shall have a yield strain not greater than 5% in both the parallel and perpendicular directions to the rise of foam. Not more than 25% of the cored samples from each 15-foot test section shall have yield strains greater than 6½% in both the parallel and perpendicular directions to the rise of foam.

d. The shape of the stress-strain curve (with strain as the abscissa) of all cored samples between 6½% strain and 40% strain shall be approximately horizontal, the maximum stress variation permitted in this strain range being 0% to +15% of the stress at the 6½% strain point.

Note that in addition to further change in its original interpretation, defendant also changed the testing requirements to "cored samples of in-place foam," whereas testing provision SC–25 above quoted called for foam "poured into corrugated paper boxes or similar containers."

Incident to the agreement to revise the specifications set out above, the following understandings and agreements were also reached:

2. It is recognized that the Contractor takes the position, among others, that in order to permit completion of the work to the requirements of specifications section 5–03 as interpreted by the Government, revisions are requisite, which is denied by the Government. It is also recognized that the Government takes the position among others, that the unrevised specifications as interpreted by it are capable of performance in accordance with the contract requirements, which is denied by the Contractor, and that the foregoing modifications are being made only to expedite performance.

\*  \*  \*  \*  \*  \*

Therefore, the foregoing changes in the specifications are made, but only upon the express understandings and agreements, as follows, namely:

A. The foregoing changes in the specifications will not be used or advanced by the Contractor as evidence of the impossibility of the performance of the specifications as originally written, and will not be used or advanced by the Contractor as alone providing a basis for any claim against, or as alone having created any right against or obligation upon, the Government \*  \*  \*.

Thereafter in August 1960, Latex tried backpacking 16 sections. Under the new testing procedures, the polyurethane backpacking in all but four of the sections was rejected.

On August 10, 1960, the defendant's contracting officer terminated Walsh's contract for default. Walsh had substantially completed its work under the prime contract, except for placement of the polyurethane.

The AEC thereafter put aside its "structural response" program for a

year or more for policy reasons unrelated to the difficulties experienced on this contract. A number of disputes had meanwhile arisen between Walsh and defendant, some of which had no relation to the polyurethane dispute. Various adjustments and modifications were made to resolve these disputes. On April 14, 1961, it was agreed that the termination for default notice above-mentioned, would instead be treated as a suspension of work with no equitable adjustment. Walsh agreed to remove the backpacking in the 12 sections found unacceptable. Defendant agreed to accept and pay for the foam in four sections.

It was further agreed that $5,000 would be deducted from the contract price for damages due to the failure of the polyurethane, with the Government reserving any rights for breach resulting from untimely performance. The negotiations continued and on January 25, 1962, another supplemental agreement was entered into (Modification No. 6) allowing Walsh an equitable adjustment under the "Changed Conditions" clause for difficulties unrelated to the polyurethane. A final contract price was agreed upon and paid.

As pertinent to this case, Modification No. 6 provided as follows:

4. It is further agreed that the amounts paid to the Contractor by the Government pursuant to the provisions of the foregoing paragraphs of this Supplemental Agreement constitutes full and complete satisfaction of any and all claims and demands whatsoever which the Contractor has against the Government arising under or by virtue of Contract AT (29–2)–929, *with the exception of the claim on behalf of the Contractor's subcontractor, Fiberglas Engineering, and Supply Division, Owens-Corning Fiberglass Corporation, and the latter's subcontractor Polytron Corporation for additional compensation and reimbursement of costs * * *,* and the Contractor hereby releases the Government from any and all of such claims and demands *except the aforementioned claim.* [Emphasis supplied.]

Thereafter, on March 5, 1962, Fenco and Polytron, with the knowledge and approval of Walsh, filed a claim for $98,579.31 which is the subject of this proceeding. On the issue of "proper plaintiffs," which has been asserted by defendant as earlier mentioned, it is observed that the contracting officer issued his decision on the claim on April 17, 1963, addressed to Walsh, and stated therein:

* * * I understand that the claim was prepared and transmitted in this way with your knowledge and approval; therefore, the claim has been considered by me as a claim of Walsh Construction Company, the prime contractor. * * *

For a better understanding of the claim before us, it is noteworthy that the contracting officer characterized it in the same way that the petition now characterizes it, namely as follows:

It is my understanding that the theory of the claim is that AEC representatives required a performance at variance with what you considered to be a reasonable interpretation of the specifications, and thereby unilaterally modified the contract; and that this unilateral modification should have converted the job into a research and development project, as well as the required performance, and provided for payment for all costs incurred.

The theory of this claim is different from the one expressed in the original claim prepared by FENCO and transmitted to us by your Mr. Schwyn with his letter dated June 21, 1960. In that claim, FENCO wrote: "It is our position that the specifications provide only for minimum requirements and that so long as those minimum requirements are met or exceeded, compliance with the contract requirements has been accomplished." Incidentally, you had taken this same position in

your letter of May 20, 1960. So that it was this statement of your view of the proper interpretation of the specifications which was before the Government at the time the foam was rejected.

In a 19-page decision the contracting officer then denied the claim, holding that:

> The plastic foam specifications called for a polyurethane foam with specified physical properties stated in terms of exact values with no stated allowable deviations.
>
> \* · \* \* \* \* \*
>
> I find nothing in the contract or in the dealings between the parties' representatives that would have caused Walsh Construction Company representatives to believe that the Government intended anything other than close compliance with the specifications as literally written. I can find no reason to believe that the Government's position respecting the performance expected, as stated in the above paragraph, could have been a surprise.

The contracting officer's decision concludes as follows:

> Based on the foregoing and other information available to me in the files, I have reached the following conclusions:
>
> 1. The foam initially placed in sections C3b–C3c–C4b and C6b did not meet the contract specifications as they were literally written. (Even with the relaxations offered by the Government.)
> 2. The foam did not meet the Contractor's nor his subcontractor's interpretation of the specifications as had been related to the Government at the time the foam was rejected.
> 3. a. The contract called for a product that would have specified physical characteristics. The contract did not state how these characteristics could be obtained. The Contractor knew he was undertaking a job which had not been done before, and he, therefore, assumed the risk of being able to perform.
>    b. If the Contractor knew in advance that the product he could produce would not serve the desired purpose, he should have advised the Government before he incurred costs for a useless product.
> 4. I do not believe that I would have the authority, retroactively, to revise this portion of a competitively-bid fixed price contract to a cost reimbursement job even if I felt that such action were warranted. This would not be fair to those unsuccessful bidders who bid the job on a fixed price basis, and would not be in the best interest of the Government.
> 5. Furthermore, I think that even if the job had been let originally as a cost-type research project as was suggested in the latest claim, the performance was of such poor quality as to raise a serious question of whether it should be paid for.
> 6. The quality of the workmanship and materials did not come up to that required under the terms of the contract.

Within 30 days, an appeal was taken to the head of the department as contemplated by the "Disputes" clause contained in the contract. The appeal recites that it "is hereby filed by FENCO-POLYTRON *by and through WALSH CONSTRUCTION COMPANY, and with the express authority of WALSH CONSTRUCTION COMPANY* \* \* \*." [Emphasis supplied.]

At the time of this appeal, the rules of procedure in contract appeals to the Atomic Energy Commission were set forth in Title 10 of the Code of Federal Regulations, Part 2, as published in 27 Federal Register 377, January 13, 1962. This was the same part that dealt with licensing responsibilities of the agency, and hence a hearing examiner system

was employed similar to that applicable to functions of the agency under the Administrative Procedure Act. Subpart D dealt specifically with contract appeals. Following are sections which appear to be pertinent to the issues which have been raised in this case:

§ 2.400  Scope of subpart.

This subpart prescribes the procedure for the disposition of appeals from decisions of contracting officers under the disputes articles of contracts with the Atomic Energy Commission and subcontracts under those contracts.

§ 2.401  Definitions.

\*   \*   \*   \*   \*   \*

(c) "Party" includes (1) the contracting officer and the prime contractor, if the dispute arises or is alleged to arise under a prime contract; (2) *the prime contractor and subcontractor, if the dispute arises or is alleged to arise under a subcontract* \* \* \*.

§ 2.415  Notification of parties by hearing examiner.

On receipt of the documents specified in § 2.414, the Secretary will transmit them to the Office of Hearing Examiners, which will assign a docket number to the appeal and transmit to all parties notice of the filing of the appeal.

§ 2.431  Conduct of hearing.

(a) The hearing will be conducted as a trial *de novo* of the issues of fact and any relevant issues of law. The hearing examiner will consider the appeal on the record for decision.

§ 2.433  Decision by the hearing examiner.

(a) When the record is closed, the hearing examiner will consider and decide the issues of fact raised by the appeal and all questions of law necessary for the adjudication of such issues of fact.

(b) The hearing examiner will make specific findings of fact and conclusions of law supported by the substantial evidence of record.

(c) *The decision of the hearing examiner will constitute the final action of the Commission thirty (30) days after its date unless any party files a petition for review within twenty (20) days of its date* or the Commission directs the record be certified to it for final decision.

§ 2.440  Commission review.

(a) A party may seek an appeal from a decision of a hearing examiner *as provided in Subpart G.*

(b) In determining whether it will grant the appeal, the Commission may take into consideration:

(1) The propriety of the award on its face, and the size of the award;

(2) Compliance by the contractor, contracting officer, and hearing examiner with the requirements of law and of the contract; and

(3) Substantial and important questions of law, policy, or discretion presented by the record. [Emphasis supplied.]

Subpart G—"Rules of General Applicability," referred to in § 2.440, above, is introduced as follows:

§ 2.700  Scope of subpart.

The general rules in this subpart govern procedure in all adjudications initiated by the issuance of an order to show cause, a notice of hearing, or a notice of appeal.

There follows a detailed hearing procedure of general applicability which appears to duplicate, to a large extent, the procedures specifically developed for contract appeals, Subpart D, above. The following sections of Subpart G appear, however, to be directly pertinent to a review by the Commission of a hearing examiner's decision in a contract case:

§ 2.763  Oral argument.

Oral argument *will not be allowed* on a petition for review. The Commission *may allow oral argument* of an appeal *after granting a petition for review.*

§ 2.770 Final decision.

(a) The Commission will ordinarily consider the whole record on review, but may limit the issues to be reviewed and consider only findings and conclusions to which exceptions have been filed.

(b) The Commission may adopt, modify, or set aside the findings, conclusions and order in the initial decision, and will state the basis of its action. The final decision will be in writing and will include:

(1) A statement of findings and conclusions, with the basis for them on all material issues of fact, law or discretion presented:

(2) All facts officially noticed;

(3) The ruling on each material exception;

(4) The appropriate ruling, order, or denial of relief, with the effective date. [Emphasis supplied.]

The opinion of the AEC hearing examiner on the appeal to the Commission, in accordance with the above outlined procedures, is dated April 1, 1964. It is a lengthy and comprehensive opinion, annexed as Exhibit B to the petition herein. As printed in that form it is 54 pages in length.

Briefly summarized, the opinion characterized the claim (as did the contracting officer and the petitioner), as one "for costs incurred in an attempt to meet the requirements of Government-drawn specifications which were alleged to be impossible to attain *under the interpretation given to the specifications* by the Government." [Emphasis supplied.]

Before the hearing examiner, the contacting officer who had previously considered and denied the claim on its merits now filed a motion to dismiss on the grounds that:

2. Note 1 *supra*.

3. Compare the form of address of the contracting officer's decision to Walsh, and the form of the appeal, both as above described.

1. The real parties in interest are Fenco and Polytron with whom the AEC has no privity.

2. Assuming that Walsh could bring the appeal on behalf of Fenco and Polytron, Walsh has no real pecuniary interest in the appeal and is barred by the Severin doctrine.[2]

3. The claim is essentially one for breach or restitution over which the examiner has no jurisdiction under the "Disputes" procedures. Relief, if any, is therefore in the courts.

4. Walsh is the only party that had a contract right to file an appeal, and it did not do so within 30 days.[3]

The hearing examiner treated grounds 1, 2 and 4 above as interrelated. After a lengthy and somewhat discursive treatment of the issues as he viewed them, the examiner concluded that "under all the circumstances of the case, it is held that Fenco and Polytron have standing to prosecute the appeal in the matter in which it is framed. It is a fact that the appeal in the form which it took was filed in time." On the remaining jurisdictional issue presented by ground 3 above, the examiner concluded that the claim was cognizable within the "Disputes" procedures under the "constructive change" doctrine,[4] and he denied the contracting officer's motion to dismiss.

Proceeding to the merits, the hearing examiner's opinion observes, by way of background, that the Nevada Test Site is under AEC management but used by other Government agencies. Its permanent staff includes personnel from Holmes & Narver, the AE earlier mentioned. The structural response program and test involved in this case was in fact conceived by another agency, the Department of Defense. During the period involved, diplomatic negotiations were taking place at Geneva directed to-

4. For an exhaustive analysis of constructive changes as cognizable under the administrative disputes procedures, see Len Co. & Associates v. United States, 385 F.2d 438, 443, 181 Ct.Cl. 29, 38 (1967), and authorities cited therein.

ward the abandonment of nuclear tests. On October 30, 1958, the United States put into effect a unilateral moratorium on tests. However, the President directed that preparation for future tests such as this one go forward as expeditiously as possible in order that they might be resumed on short notice, depending on the progress of the negotiations.

A Dr. Merritt, of the University of Illinois, was selected to work on the basic criteria for the tests and a Mr. Kwan of the AE was assigned to the project. Dr. Merritt's experience had been on the theoretical effect of blast on materials and he considered the Nevada Test Site as a "laboratory" where these theories could be evaluated. In this connection, he sought a suitable material to act as an energy or shock absorber between the rock walls and the structural material lining the tunnel. He became interested in polyurethane, and particularly in an "in place" installation. He studied data supplied by the Structural Mechanics Research Laboratary of the University of Texas, which was doing research for the Air Force on urethane foam as cushioning for equipment and materials dropped from planes.

Polyurethane is classified as flexible, semiflexible, and rigid since varying yield strength and modulus of elasticity can be produced by variations in the foam system. Flexible foam, similar to foam rubber, is used, for example, for cushioning in the furniture industry. Dr. Merritt concluded that he needed a rigid foam capable of absorbing and evenly distributing shocks of the magnitude that he contemplated for his proposed tests. Knowing of Union Carbide's work in the field of polyurethane chemistry, Dr. Merritt consulted that company's Mr. Shields who told him of work being done at Carbide's research laboratories by Dr. Fritz Hostettler. The latter, European trained, is ad-mittedly one of the leading world authorities in the field.

Dr. Merritt wrote Dr. Hostettler [5] and outlined his problem. On September 8, 1959, a Dr. Harding on Dr. Hostettler's staff, replied [6] to Dr. Merritt. Following are some pertinent extracts from that reply:

\* \* \* These polyurethane foam systems are quite a recent development and have not been studied in great detail yet from the point of view of structural applications. For any specific end use, some development work would almost certainly be required.

\* \* \* \* \* \*

\* \* \* The two major reactants may combine entirely during the foaming step (one-shot process), or they may be partially reacted (prepolymer process) prior to this time. In the latter case the exotherm achieved is lower, products generally tend to be more highly orthotropic mechanically, and additional manufacturing expense is involved. In many applications, the prepolymer process is now favored for rigid foams because it is somewhat easier to control, but it is not anticipated that this will continue to be the case.

\* \* \* \* \* \*

Because the reactants are liquid, they can be poured into a cavity and permitted to foam there. The resultant plastic is generally itself a good adhesive, at least for wood and clean metals. The density obtained will depend on the concentration of blowing agent included in the formulation, but also on the dimensions and temperature of the cavity to be filled. \* \* \* Foamed plastics have been sprayed by others with some success, but this would not appear practical for a cavity of 6″ deep or against rock at 50° F. A simple pour, repeated at proper in-

5. The hearing examiner included this letter of August 31, 1959, as Appendix B to his opinion.

6. Incorporated as Appendix C to the hearing examiner's opinion. In a footnote at this point in his opinion, the hearing examiner states: "The case was very thoroughly documented. It is felt that the two letters, Appendices B and C, are the most important of all the documents."

tervals, should prove more efficient and more economical.

The fumes given off are those of the isocyanate. * * * Extended exposure can induce an asthmatic condition and may irritate the eyes, even at such low concentrations. Asthmatics should never breathe the fumes. * * * Our laboratory people who deal daily with this material do as much work as possible in ventilated fume hoods. Some wear respirators containing activated carbon cartridges. In case of an asthmatic attack, administer oxygen and avoid further contact with fumes. The liquid isocyanate may be absorbed through skin contact, and sensitization may occur also in this manner.

* * * * * *

To our knowledge, no data are available for materials of this type which were tested dynamically. Some higher density flexible polyurethanes have been used in drop-tests or packaging tests, but these would not economically provide load-bearing in the range in which you expressed interest.

In static compression tests, rigid foams of almost any chemical type known exhibit yield points in the neighborhood of 3 to 10% deflection. This would appear to be a function of their cell structure. The elastic limit of urethane foams is found at about 2 to 3% compression; at this point their load-bearing is about 70% of the magnitudes of the conservative yield strengths tabulated below for room temperature:

| Density, pcf | Parallel to Foaming Direction | | Perpendicular to Foaming Direction | |
| --- | --- | --- | --- | --- |
| | Yield, psi | Elastic Mod., psi | Yield, psi | Elastic Mod., psi |
| 2 (one-shot) ............... | 25 | 1000 | 20 | 600 |
| 2 (prepolymer) ............ | 40 | 1600 | 20 | 600 |
| 3 (one-shot) ............... | 50 | 2000 | 40 | 1200 |
| 3 (prepolymer) ............ | 70 | 2800 | 40 | 1200 |
| 4 (one-shot) ............... | 90 | 3600 | 60 | 1800 |
| 4 (prepolymer) ............ | 120 | 4800 | 60 | 1800 |
| 5 (one-shot) ............... | 130 | 5200 | 90 | 2700 |
| 5 (prepolymer) ............ | 150 | 6000 | 90 | 2700 |
| 6 (one-shot) ............... | 170 | 6800 | 120 | 3600 |
| 6 (prepolymer) ............ | 190 | 7600 | 120 | 3600 |

*The reported moduli are minimum estimates.* [Emphasis supplied.]

No cure is required if transient friability at the surfaces of the foam poses no problem. In the event that it is desired to avoid any possibility of such a phenomenon, the mold cavity may be preheated by radiant heat or by convection: the mold may also be heated to 160° F for about 10 minutes after the foam has completed its rise. Since these foams are excellent thermal insulators and are soft when first made, they should not be severely loaded mechanically until their interiors have had an opportunity to cool to the neighborhood of 160° F. For a 6" thickness this may be a matter of several hours.

After receipt of the above letter, Dr. Merritt had several meetings with Mr. Kwan of the AE staff. The hearing examiner's opinion recites that Mr. Kwan "testified that at the time he drafted the specifications he had no personal knowledge or experience with polyurethane but relied solely on Dr. Harding's letter." It

will be noted that the above quoted letter sets forth a tabulation of yield strengths. The next to the last line in the tabulation is as follows:

| Density, pcf | Parallel to Foaming Direction | | Perpendicular to Foaming Direction | |
|---|---|---|---|---|
| | Yield, psi | Elastic Mod., psi | Yield, psi | Elastic Mod., psi |
| 6 (one-shot) ......... | 170 | 6800 | 120 | 3600 |

Mr. Kwan testified that he lifted these values from the letter and incorporated then into the specifications. However, it is observed that he did not lift the sentence appearing at the end of the table, above quoted, to the effect that "[t]he reported moduli are minimum estimates."

The opinion of the hearing examiner states that as conceived by Dr. Merritt "the success of the whole operation hinged on the foam in place uniformly meeting precisely the mathematically defined properties set out in the specifications." The issue in this case is whether or not, by the words it selected for specification section 5–03, the Government conveyed that concept and that purpose to contractors (and their subcontractors) when they were invited to submit proposals for this construction project. The hearing examiner found that it had not, and that no official connected with the tests advised Fenco and Polytron that precise values were required.

It was further found by the hearing examiner that the meaning which the Government sought to convey was impossible to fulfill, in any event. He held, in part, that:

Polyurethane chemistry is a highly specialized and esoteric field of organic chemistry. * * *

As indicated, set polyurethane is the result of a volatile reaction and from the nature of things there are certain inherent vagaries. From the evidence there is no doubt that as the state of the art existed in 1959, it was impossible to install foam meeting the precise values set out in the specifications in an "in-place" operation of the type involved with a tolerance of ±10%. Three very well-qualified experts were unanimous in their opinion in this regard. In the first place, Mr. Jennings told all concerned that it was impossible when he abandoned the effort in June 1960. He took the stand and explained more fully why, in his opinion, it was impossible. Polytron is one of the largest producers of polyurethane foam systems in the world and Mr. Jennings is a recognized expert. He is a consultant in polyurethane matters to the Mitsui interests in Japan and Pfizer Limited, a division of Charles Pfizer Company, which produces and distributes foam in England. The appellants called Mr. Robert A. Stengard of the DuPont Company, who has spent nine years in research in the urethane field, eight of which involved polyurethane. He was positive in his testimony with respect to the impossibility of meeting the precise values under the circumstances. Finally, Dr. Hostettler was called. As stated, he is recognized as one of the leading authorities. He was positive in his opinion with respect to impossibility. The Government called as its expert, Mr. Brooke Anderson, who has specialized in urethane chemistry. He did not dispute the opinion of the other experts with respect to the question of impossibility.

In addition to the expert opinions, the history of the operation demonstrated very clearly the fact of impossibility. First Polytron tried and failed. Second, Latex, which was very knowledgeable in the field, tried under relaxed specifications and failed. There is no evidence that anyone anywhere

has ever attained the end demanded. It appears that after the operation was suspended on August 10, 1960 the Commission entered into a research and development contract with E. I. Thompson and Company for the purpose of determining whether or not it was possible to meet the precise values in an "in-place" operation. This research was carried on for a period of five weeks. Although there is some question as to whether the research was carried to its final conclusion due to the end of the moratorium in September 1961 and the importance of carrying out tests as quickly as possible, it is a fact that during the period E. I. Thompson was unable to attain the desired values. When a test was finally made in 1962, the polyurethane was precast by E. I. Thompson in its shop or factory and placed as backpacking.

The fact is that as a practical matter it was not remotely possible to install foam meeting the precise values ±10% under the circumstances. * * *

Mr. Jennings, the President of Polytron, described by the hearing examiner as "one of the most knowledgeable firms in the world with respect to polyurethane," Mr. Trueblood, an engineer with Fenco, Mr. Stengard of DuPont, and Dr. Hostettler of Union Carbide, all testified that they construed the values given in the specifications as minimums, not as precise values.

One of the above witnesses, Mr. Trueblood, testified that "in the construction field, at least in my experience in the insulation end of it, if no tolerances are given, we assume that they must mean minimum." Dr. Hostettler, reached the same conclusion because the testing for compliance was to be of box samples in accordance with SC–25, above quoted, and not a test of foam in-place. Since this is a very imprecise test (foam in boxes will differ from foam in place), he concluded that absolute precision in the rock cavity was not contemplated and that he would have "simply tried to meet the minimum requirements of this type of a job because I would have had to go to very large expense otherwise to find out what was going to happen."

On the matter of whether the plaintiff was privy to this classified Government research, and the intent and objectives in the minds of the Government's representatives, the hearing examiner states:

* * * At the time the precise purpose and much of the detail of the tests were classified. At the outset practically all Fenco and Polytron knew was that an underground blast was to be set off and its effect on certain materials measured. A short time before the effort to place the foam in May, Mr. Jennings did go down into the tunnel and made a survey which must have revealed much of the detail. It is admitted that prior to May 15 no official connected with the tests advised Fenco and Polytron that precise values were required. Mr. Trueblood and Mr. Jennings stated that from their limited knowledge of the operation they assumed that the sole function of the polyurethane was to act as a shock absorber. Thus, within reasonable limits, the stronger it was, the better. They looked on the specification as being similar to a specification for structural steel to be used for support. This was certainly a reasonable view. In this connection it should be borne in mind that neither Polytron nor Fenco sought out the work. They were called in because of their qualifications by Walsh. As soon as Mr. Jennings learned that precise values were demanded ±10%, he advised all concerned that it was an impossible undertaking and withdrew, thus cutting off further expense.

With the benefit of the foregoing facts, the 952 pages of testimony over which he had presided, and 48 exhibits, the hearing examiner concluded as follows:

Viewing all the evidence, it is concluded that Polytron at least deserves "E for effort" throughout. The curtain was rung down on it very abruptly under the circumstances. In the end the comparison of the precast foam which was later used to the foam which

was installed in May merely points up the basic impossibility of meeting the requirements under the circumstances. At the time Polytron could never have satisfied the Government *under its interpretation of the specifications.* Latex could not under relaxed specifications. E. I. Thompson could not under a research and development contract. * * * [Emphasis supplied.]

* * * * * *

Dr. Merritt on several occasions in his testimony remarked on the pressures with respect to time. As observed, it was clear that both he and Mr. Kwan were capable and careful structural engineers. However, in the end it is plain that the part of the specifications dealing with polyurethane was hastily conceived and hastily executed. The Government representatives were moving into a very technical and esoteric realm of science which, admittedly, they knew nothing about. * * * Note the reference in the first paragraph to foam manufactured by Union Carbide. It was established that at the time Union Carbide did not manufacture polyurethane foam, but only manufactured certain of the resins or ingredients. Also in the same paragraph note the requirement of the "one-shot" process. Due to the exothermic heat generated by the "one-shot" process and the mechanical difficulties attendant to this type of application, it was not suited to the conditions in the tunnel. This requirement was abandoned. *As stated, the values in the second paragraph were taken from Dr. Harding's letter, overlooking his statement that they mere minimums.* The third paragraph was applicable to foam placed behind the wooden liners typified by Sections C3c and C3b. It had no application to the metal liners typified by C4b and C6b. Last, as previously noted, the box test had no relevance to the operation as it was conceived. No doubt in the historical setting there was very good rea-

son for the Government's haste. However, it would be unfair indeed for the Government's haste to waste Fenco's and Polytron's time and money. They should be made whole. Accordingly, *the case is remanded to the Contracting Officer to work out an equitable adjustment with Polytron and Fenco in accordance with this decision.* [Emphasis supplied.]

* * * * * *

This decision becomes the final decision of the Commission within thirty days unless an appeal is taken within twenty days or unless the Commission decides to review the matter on its own motion.

On April 20, 1964, the contracting officer filed a petition for review pursuant to the rules above quoted. In a brief 4-page opinion dated June 10, 1965, signed "By the Commission. W. B. McCool, Secretary," the exceptions of the contracting officer were allowed, the decision of the hearing examiner reversed, and the claim dismissed.

The first paragraph of this decision reads as follows:

A decision of a hearing examiner has granted a substantial recovery against the Government as an equitable adjustment to a subcontractor and a sub-subcontractor under a fixed price prime contract. We reverse this decision and dismiss the claim on the grounds that these appellants have no standing to prosecute the claim. We also find that the merits of the claim do not warrant an equitable adjustment.

In summary, the Commission did not treat the appeal as one asserted "by and through Walsh Construction Company" but rather observed that "[t]he hearing examiner held that although there was no privity of contract between either appellant and the Government, the Commission by adopting 10 CFR §§ 2.400 and 2.401 gave a subcontractor the right to appeal when a subcontract includes a disputes clause. We disagree." [7]

---

7. Although the hearing examiner's opinion is discursive and perhaps unnecessarily

complicated on this point, a fair reading demonstrates that he ultimately relied

The Commission decision also briefly raises and negates the suggestion that this claim was assignable. However, it is nowhere suggested that this claim was assignable, or that Walsh had attempted to assign it. The opinion then briefly alludes to error in the hearing examiner's decision for his failure to apply the *Severin* doctrine.[8]

Finally, in two paragraphs devoted to the merits, the Commission concluded:

> We find that Fenco and Polytron knew that the work required compliance with unique specifications to achieve a result beyond the state of the art when the contract was entered into. They were experts in the field and contracted to perform according to the specifications. We hold that the inherent difficulty of the work was not sufficient to require restitution to Fenco and Polytron for their efforts to perform; no benefits were actually conferred on the government. Smoot's Case, 82 U.S. 36, 46 [21 L.Ed. 107]; Saxl v. United States, 119 Ct.Cl. 66; American Law Institute, Restatement of Contracts § 468.

> We do not agree that the allowance of a 10 per cent tolerance in the specifications amounted to a change order entitling Fenco & Polytron to equitable adjustment in the contract price. If the allowance was a change order, it benefitted Fenco and Polytron by relaxing the contract requirements. We overrule the hearing examiner's finding that appellants are entitled to relief on the theory of a constructive change order.

In his motion for summary judgment before this court, plaintiff's counsel advises that his request for an oral hearing before the Commission was opposed by the contracting officer and denied. He therefore urged that he be granted the opportunity of a conference with or oral argument before the commissioner of this court "[d]ue to the complexity of the facts involved in this case and the failure of the Commission to make detailed findings of fact and conclusions of law * * *."

The opportunity for oral argument was granted on January 28, 1969. At that oral argument, plaintiff's counsel made it clear that the decision being reviewed in this proceeding was the result of an indirect appeal to the agency, and not on a direct appeal by the subcontractors; that it was not brought under the "Disputes" clause incorporated by reference in the subcontracts, but under the "Disputes" clause in the prime contract; that the choice of the words, Fenco and Polytron "by and through" Walsh, was deemed to be the equivalent of Walsh "for and on behalf of" Fenco and Polytron. Additional facts, and additional arguments presented are discussed in the treatment of the issues which follow:

### The "Proper Plaintiffs" Issue

As earlier set forth, the contracting officer, in rendering his adverse decision on this claim, addressed it to Walsh and stated:

> * * * I understand that the claim was prepared and transmitted in this way with your knowledge and approval; therefore, the claim has been considered by me as a claim of Walsh Construction Company, the prime contractor.

We also so regard it, as indeed we must. A contractor's suit on a contract with the Government traditionally depends upon plaintiff being in privity with defendant in the contract which is the subject of the suit.[9] Judgment could be entered solely in favor of plaintiff prime contractor, if the facts and the law so

---

on the authorities which recognize the right of a prime contractor to bring a claim for and on behalf of subcontractors, *i. e.*, for their use and benefit. His *opinion* treats extensively with the "indirect" appeal of subcontractors through their prime contractor.

8. Note 1 *supra*.

9. See United States v. Blair, 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039 (1944); Merritt v. United States, 267 U.S. 338, 45 S.Ct. 278, 69 L.Ed. 643 (1925).

warrant. Any reference in the caption to subcontractors not in privity with the Government, can be regarded solely as descriptive of the prime contractor's claim.

Unnecessary and unfortunate confusion has been created on this issue by the use of the words "by and through" rather than the more conventional and far more frequently used "for and on behalf of"; by the incorrect references in the plural to "plaintiffs"; by the inaccurate intermingling in the hearing examiner's opinion of this issue of "standing to sue," with the *Severin* doctrine issue hereinafter separately discussed; by the fact that the contract appeal procedures of AEC afford greater (not lesser) recognition of subcontractors than do the administrative procedures of other contracting agencies; and by the hearing examiner's partial but unnecessary reliance on the AEC's special willingness to deal directly with subcontractors in certain instances, as described in the above quoted regulations.

█ Viewed as a suit by Walsh for the use and benefit of Fenco and Polytron, as intended by plaintiff's counsel, and as it must be viewed in this court, this "proper plaintiffs issue" (or "standing to sue" issue as it is sometimes called), has been enlarged out of all proportion. As the hearing examiner stated in one part of his opinion:

\* \* \* In the instant case, the appellants throughout preserved their right to bring the appeal "by and through" Walsh and Walsh has expressly consented to this type of procedure. It has not assumed merely a passive role. Its vice president attended the hearing on the motion to dismiss and at the examiner's request took the stand. In fact, the Contracting Officer's decision is addressed to Walsh. \* \* \*

This court has treated the matter of a prime contractor's right to sue for the use and benefit of subcontractors quite routinely,[10] and so also have the various boards of contract appeals in the administrative handling of such claims. As the hearing examiner in his opinion in this case correctly states:

Generally speaking the various boards in determining the standing of a subcontractor to invoke the disputes clause follow the pattern set by the Court of Claims. \* \* \* Again following the procedure of the Court the boards have consistently allowed the prime to appeal on behalf of the subs. Such appeals are called "indirect" appeals. They are entertained even though the prime has no real interest in the matter and plays a completely passive role \* \* \*.[11]

---

10. *See,* for example, Morrison-Knudsen Co. v. United States, 397 F.2d 826, 851, 184 Ct.Cl. 661, 702 (1968); Snare & Triest Co. v. United States, 57 Ct.Cl. 151, 159 (1922).

11. Citing N. S. Stavrou, Inc., 1963 BCA ¶ 3927; D & L Constr. Co., 1963 BCA ¶ 3676; Tidewater-Kiewit-P.E.C., 61-2 BCA ¶ 3178; Irvin Prickett & Sons, Inc., 60-2 BCA ¶ 2747; Patti-MacDonald & Associates, 60-2 BCA ¶ 2709; Harris Coal Co., 58-1 BCA ¶ 1688.

In his brief and reply brief, plaintiff cites, in addition to the above, TRW, Inc., 66-2 BCA ¶ 5882; Carpenter Steel Co., 65-1 BCA ¶ 4796 (this is a case of the AEC Board of Contract Appeals); Farnsworth & Chambers Co., 60-2 BCA ¶ 2717; A. S. Horner Constr. Co., 59-2 BCA ¶ 2321; Fanderlik-Locke Co., 59-1 BCA ¶ 2254; Ramsey-Leftwich, 59-1

BCA ¶ 2218; J. M. Brown Constr. Co., 57-2 BCA ¶ 1377; Aerojet-General Corp., 67-1 BCA ¶ 6197.

Nor is the relative zeal with which a prime contractor presses a suit brought in its name, an issue, other than its bearing on the merits. *See* particularly, *TRW, Inc., supra,* to illustrate that the Armed Services Board of Contract Appeals will entertain an appeal in the name of the prime contractor, even where the latter has not incurred a loss nor acknowledged liability to the subcontractor. As stated therein at p. 27,296:

"\* \* \* The prime contractor may pursue the claim himself directly or he may authorize the subcontractor to make the claim in his name and to appeal any denial thereof in a final contracting officer's decision in accordance with the prime contract's Disputes clause. To do

It is common knowledge that maximum subcontracting of Government contracts is encouraged as a matter of national policy by committees of the Congress, by the regulations of each contracting agency, and by the Small Business Administration. As a result, it is quite natural that subcontractors are the real parties in interest in an equally substantial proportion of the controversies which grow out of this vast Government contracts program. To preserve the concept of privity, these matters are regularly brought on behalf of subcontractors by the prime contractor, as illustrated by the cases cited in footnotes 10 and 11, *supra.*

In summary, the above discussed issue constitutes no bar to consideration of this case on its merits.

### The Severin Doctrine Issue

As earlier related in this opinion, when a final contract price was agreed upon between Walsh and the Government in the earlier described Modification No. 6, it provided for a release of Walsh's claims *"with the exception of the claim on behalf of the Contractor's subcontractor Fiberglas Engineering and Supply Division, Owens-Corning Fiberglas Corporation, and the latter's subcontractor Polytron Corporation, for additional compensation and reimbursement of costs * * *,* and the Contractor hereby releases the Government from any and all of such claims and demands *except the afore-mentioned claim. * * *"* [Emphasis supplied.]

Walsh was apparently the party "out of pocket" when the above described disputes arose, culminating in a termination, later converted to a suspension of its prime contract. While these reserved administrative claims were being pursued in accordance with the procedures earlier described, Walsh was therefore also pressing an alternative form of relief against its subcontractors.

As stated by the hearing examiner in his opinion:

* * * On November 27, 1961 Walsh sued Fenco for breach of its contract to place the foam. On January 18, 1962 Fenco filed a third party complaint against Polytron; its parent, Pacific Vegetable Oil; and Latex for their failure to perform. On May 21, 1962, Polytron answered the third party complaint of Fenco and filed counterclaims against Fenco and Walsh to recover the amount of its losses in the operations. * * *

The claims involved * * * were finally settled. Fenco paid Walsh $60,000; Latex paid Fenco $35,000. Some $22,000 of this amount was earmarked in the $60,000 which Fenco paid to Walsh for the removal of the foam which Latex had laid in August. Polytron agreed to pay Fenco $42,500, which was the amount of progress payment that had been made by Fenco to Polytron when it made its attempt to install the foam in May. * * * On April 22, 1963 Fenco and Polytron signed a release of all claims against Walsh. This release provided that Polytron and Fenco could prosecute the present appeal before the Commission in the name of Walsh at no cost to Walsh. Thereafter on May 6, 1963 all parties filed a stipulation in the District Court dismissing the pending actions with all claims and counterclaims with prejudice. * * *

this, the prime contractor need not agree that he will be liable to the subcontractor regardless of the decision. Where the identical questions are in the dispute under the prime contract and subcontract, it is sufficient that the prime contractor acknowledge that he will be liable to the subcontractor if the Government is liable to him. * * * The fact that on balance the prime contractor thinks the claim unjustified does not destroy the right to appeal. All the prime contrac-tor is doing by proceeding or permitting the subcontractor to proceed in its name is seeking an authoritative determination in the forum that might ultimately have to decide the issue anyway.

"In this appeal, TRW, by the use of Article 15(h), has authorized Itek to bring this appeal in its name. Itek has done so and therefore as a technical matter TRW has requested payment of the disputed costs. * * *".

The release referred to in the above excerpt reads, in pertinent part, as follows:

### General Release

FOR VALUABLE CONSIDERATION, * * * the undersigned [Owens-Corning Fiberglas Corporation, Polytron Corporation, and Pacific Vegetable Oil Corporation] * * * do fully and forever release and discharge WALSH CONSTRUCTION COMPANY * * * from and against any and all claims * * * in connection with the Mercury Project at or near Mercury, Nevada, in the years 1959–61, inclusive, arising or resulting from work done or attempted, including insufficient or defective performance or nonperformance thereof, in connection with said project. or under any contractual documents relating thereto * * * save and except that *it is understood and agreed that there is expressly reserved and excepted from this release any and all claim or claims* ("CLAIMS") heretofore made by Owens-Corning Fiberglas Corporation (also D/B/A Fiberglas Engineering & Supply Company) or Polytron Corporation through Walsh Construction Company to and now pending with the United States Atomic Energy Commission and *arising out of or in connection with the furnishing and/or installation of polyurethane foam* by Owens-Corning Fiberglas Corporation (also D/B/A Fiberglas Engineering & Supply Company) or Polytron Corporation to Walsh Construction Company and/or the United States Atomic Energy Commission under General Contract No. AT (29–2) 929 between Walsh Construction Company and the United States Atomic Energy Commission, it being further understood and agreed that, without cost or expense to Walsh Construction Company, said CLAIMS shall be prosecuted, without bar or prevention or hinderance by reason of or as a consequence of this release, in the name of *Walsh Construction Company* against the United States Government and/or the United States Atomic Energy Commission in the manner and to the extent directed by Owens-Corning Fiberglas Corporation and that *any sum received by Walsh Construction Company from the United States Government* and/or the United States Atomic Energy Commission on account of said CLAIMS *is hereby excepted from this release and when received shall be forwarded and paid over by Walsh Construction Company* to Owens-Corning Fiberglas Corporation, and it being further understood and agreed that upon determination by Owens-Corning Fiberglas Corporation to terminate further prosecution of said CLAIMS or upon denial of said CLAIMS *or upon payment over to Owens-Corning Fiberglas Corporation of such sum,* if any, as may be received by Walsh Construction Company on account of said CLAIMS, *then and in such event the foregoing reservation and exception from this release shall thereupon be of no further force and effect.* [Emphasis supplied.]

In furtherance of their settlement, as aforesaid, the parties to the above described action stipulated its dismissal by the court as follows:

### Stipulation for Dismissal of Action and All Claims Embraced Therein with Prejudice

IT IS HEREBY STIPULATED by Plaintiff and Cross-Defendant WALSH CONSTRUCTION COMPANY, Defendant, Third Party Plaintiff and Cross-Defendant OWENS-CORNING FIBERGLAS CORPORATION, Third Party Defendants and Cross-Claimants and Counter-Claimants AMERICAN LATEX PRODUCTS CORPORATION, POLYTRON CORPORATION and PACIFIC VEGETABLE OIL CORPORATION, through their respective counsel, that the above entitled action, including the complaint, the third party complaint and the respective cross-claims and counter-claims of the parties therein

shall be dismissed with prejudice, each party to bear its own costs.

The Clerk of the above entitled Court is hereby directed and requested to enter this Stipulation for Dismissal of Action and All Claims Embraced Therein With Prejudice which shall operate as a retraxit.

Despite the reservations and exceptions above noted in Modification No. 6 to the contract, and in the quoted release, defendant urges that Walsh's right to recover is barred by the so-called *Severin* doctrine, earlier mentioned.[12] The *Severin* cases were suits for damages for breach of contract. Part of the damages sought were incurred by a subcontractor who in his subcontract with the plaintiff had completely absolved the latter from any liability for damages of the type being sought, with the result that recovery was limited to the damages incurred by plaintiff.

That rule has no application to this set of facts since the claim presented here has been repeatedly and expressly reserved and excepted in the contract modification reciting the terms of final payment, and in the settlement release following the above described litigation. The terms of the reservation and exception specifically authorize the prosecution of this claim in the name of Walsh Construction Company, and commit the latter to forward and pay over to its subcontractor any sum received by Walsh from the United States on account of this claim. Walsh is released on account of this claim, only if there is an election that it will not be further prosecuted, or if it is denied by the Government, or if amounts recovered by Walsh are paid over to the subcontractor.

It has been repeatedly held that the *Severin* cases are inapposite where the prime contractor has been only conditionally absolved, pending the outcome of its claim against the Government.[13] As the hearing examiner pointed out in his opinion, the release above quoted appears to comport with the "format approved" by this court in the *Donovan* case cited in footnote 13. We observe further that its language and substance parallel that in *Barnard-Curtiss*, also cited in that footnote.

At the oral argument earlier mentioned, plaintiff's counsel pointed out that the release represents the agreement between Walsh and its subcontractor, and that any failure on the part of Walsh to comply with its terms would be in breach of that agreement. Defendant, in contrast, would read the stipulation of dismissal addressed to the district court in which the litigation was pending as an independent instrument, when in fact it must be read in conjunction with the release agreement on which it depends.

Plaintiff also argues, and quite correctly, that since this is not a suit for damages for breach of contract as present in the *Severin* cases, but rather a claim for an equitable adjustment by a prime contractor pursuing a remedy redressable under the contract terms, the *Severin* doctrine is not applicable. In *Blount Bros. Constr. v. United States*,[14] this court held in such circumstances that "we accept the contention of plaintiff that the exculpatory clause did not affect plaintiff's liability to its subcontractor insofar as *claims under the prime contract* were concerned. Therefore, if the present claims are encompassed by the terms of plaintiff's contract with the Navy, then the *Severin* rule is not a bar." [15]

---

12. Note 1 *supra*.

13. Barnard-Curtiss Co. v. United States, 301 F.2d 909, 157 Ct.Cl. 103 (1962); Donovan Constr. Co. v. United States, 149 F.Supp. 898, 138 Ct.Cl. 97, cert. denied, 355 U.S. 826, 78 S.Ct. 34, 2 L.Ed. 2d 39 (1957). *See also* United States v.

Blair, 321 U.S. 730, 64 S.Ct. 820, 88 L. Ed. 1039 (1944).

14. 172 Ct.Cl. 1, 348 F.2d 471 (1965).

15. The Boards of Contract Appeals have held the *Severin* doctrine inapplicable to cases where the claim is one for an equitable adjustment redressable under the

All of the foregoing considered, the *Severin* doctrine also fails as a bar to consideration of this case on its merits.

### The Merits

One uncontested fact stands out clearly in this record. The specifications, as interpreted by the Government, were impossible to perform. In the "General Statement of Facts," earlier set forth, there are summarized the findings of the hearing examiner on this point, and they are overwhelmingly supported by the comprehensive record over which he presided.

■ This conclusion is characterized as "uncontested" because the brief decision of the Commission reversing the hearing examiner does not dispute that finding. It rather seeks to avoid it by concluding that the burden of this impossibility fell upon the contractor, and not upon the agency which prepared these specifications unilaterally and without disclosure of their intent, as above described. This conclusion of the Commission is fundamentally one of law and carries with it no characteristics of finality on review in this proceeding.[16]

As a matter of fact, the Commission acknowledges this when it states:

> In conclusion, we find the hearing examiner erred in deciding that appellants should be granted relief on the merits, *and in granting relief beyond the authority of the Commission.* [Emphasis supplied.]

■ That conclusion is in error. The contrary conclusion of the hearing examiner, on the other hand, is supported by a long line of cases holding that the Government warrants the sufficiency of its specifications and should respond in damages or equitable adjustment should they prove to be defective or impossible to perform.[17]

In Hollingshead Corp. v. United States,[18] for example, this court stated:

> We see no justification for throwing upon the plaintiff a loss which is a direct result of faulty specifications promulgated by the Government.

That, however, is what defendant seeks to do in this case. It urges that plaintiff "assumed the risk" of performance, based on the holding in Austin Co.

contract terms. *See* for example, A. DuBois & Sons, 60–2 BCA ¶ 2750; Morrison-Knudsen Co., 60–2 BCA ¶ 2799, both cited by this court in the *Blount* case (note 14 *supra*) at 5, n. 3.

16. Wunderlich Act, 68 Stat. 81, 41 U.S.C. §§ 321, 322 (1964 ed.).

17. United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); Centre Mfg. Co. v. United States, 392 F.2d 229, 183 Ct.Cl. 115 (1968); WRB Corp. v. United States, 183 Ct.Cl. 409 (1968); Luria Bros. & Co. v. United States, 369 F.2d 701, 177 Ct.Cl. 676 (1966); North Am. Philips Co. v. United States, 358 F.2d 980, 175 Ct.Cl. 71 (1966); J. D. Hedin Constr. Co. v. United States, 347 F.2d 235, 171 Ct.Cl. 70 (1965); Laburnum Constr. Corp. v. United States, 325 F.2d 451, 163 Ct.Cl. 339 (1963); Helene Curtis Indus., Inc. v. United States, 312 F.2d 774, 160 Ct.Cl. 437 (1963); Hollingshead v. United States, 111 F.Supp. 285, 124 Ct.Cl. 681 (1953); Stapleton Constr. Co. v. United States, 92 Ct.Cl. 551 (1940); Steel

Prods. Eng'r. Co. v. United States, 71 Ct.Cl. 457 (1931); Penn Bridge Co. v. New Orleans, 222 F. 737, cert. denied, 239 U.S. 639, 36 S.Ct. 160, 60 L.Ed. 481 (1915); Bush v. Jones, 144 F. 942 (1906); and Sickels v. United States, 1 Ct.Cl. 214 (1865).

The hearing examiner in his opinion also cites Maxwell Electronics Corp., 1963 BCA ¶ 3916; Pastushin Indus., Inc., 1963 BCA ¶ 3757; Northeastern Eng'r. Inc., 61–1 BCA ¶ 3026; Belco Eng'r. Co., 60–2 BCA ¶ 2842; Spencer Explosives, Inc., 60–2 BCA ¶ 2795; T. Barry Kingman Marine Constr., 60–2 BCA ¶ 2756; Unexcelled Chem. Corp., 60–1 BCA ¶ 2587; J. W. Hurst & Son Awnings Inc., 59–1 BCA ¶ 2095; Robbins Mills, Inc., ASBCA No. 2255 (1956); Miles Constr. Co., U.S. AEC Docket No. CA–151; Nash, Impossibility of Performance, George Washington Univ. Law Center, Government Contracts Monograph No. 4, at 21.

18. Note 17 *supra*, 111 F.Supp. at 286, 124 Ct.Cl. at 684.

v. United States.[19] But *Austin* did not overturn the *Spearin* line of cases cited in footnote 17. On the contrary, it is consistent with those cases. A unique set of facts was presented by *Austin*. The plaintiff, not the defendant, drafted the specifications and urged them upon defendant as being possible to perform. Therefore, the court was applying the *Spearin* rule, as it stated, in a situation where the usual facts were just reversed.[20]

In contrast, the historical development of these specifications as earlier outlined was "in-house" and rather guarded because of the classified nature of the tests for which the material was to be employed. Bidders were not made privy to the Government's research. In fact the Government did not carry over the recommendations of the experts it consulted when it omitted the reference to "minimum values" in the tables on which it relied. We now know that the result which it had in mind, precise and not minimum values, was impossible of attainment. It was like hitting a bullet with a bullet. The qualified manufacturers of polyurethane who tried to comply with the Government's interpretation of the specifications all failed, even when the specifications were changed, or "relaxed," if we accept the Government's interpretation of them. Eventually the program was abandoned. It was apparently tried later by the entirely different method of backpacking with precast slabs of polyurethane.

In fact, the Commission does not in its brief opinion overturning the hearing examiner's opinion, actually confront the issue which plaintiff has sought to have resolved from the inception of its claim. Plaintiff has urged that this is an "interpretation" problem; that the interpretation that it and the experts who testified at the administrative hearing placed upon section 5–03 was the only reasonable one that a person knowledgeable in polyurethane chemistry and manufacture would assume; that since this was a reasonable interpretation differing from the interpretation placed upon the specifications by the party which drafted them, plaintiff was entitled to have its interpretation prevail under the *contra preferentum* rule.[21] This rule is *a fortiori* for application where the drafting party's interpretation is wholly unreasonable, because it seeks to invoke an impossibility.[22]

The hearing examiner found that "[n]ot only was Fenco's and Polytron's interpretation of the specification within the zone of reasonableness, it was the most reasonable interpretation according to the understanding in the trade." The record indicates incontrovertibly that at all times pertinent to this litigation, a specification such as section 5–03 would be interpreted by those educated in the art of *rigid* polyurethane production and in light of the custom and state of the art as requiring minimum values, tested in boxes. The defendant offered no evidence suggesting a contrary conclusion, and the "no tolerance" interpretation which it initially demanded was not possible of attainment in a laboratory, much less under the trying field conditions present in this case.

It is noteworthy that the Government did not ask for a reduction in price for "relaxing" this requirement to a tolerance of $\pm 10\%$, a requirement which was also found to be impossible. Such a reduction in price would have been mandated had the Government's original in-

---

19. 314 F.2d 518, 161 Ct.Cl. 76, cert. denied, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed. 2d 62 (1963).

20. *Austin*, note 19 *supra*, affirmed a decision of the Armed Services Board of Contract Appeals, 61–1 BCA ¶ 2927. *Cf*. E. L. Cournand, Inc., 60–2 BCA ¶ 2840, incidentally involving fiberglass specifications bearing some resemblance to the product involved in this case.

21. Southern Constr. Co. v. United States, 364 F.2d 439, 453, 176 Ct.Cl. 1339, 1362 (1966); WPC Enterprises, Inc. v. United States, 323 F.2d 874, 876, 163 Ct.Cl. 1, 6 (1963).

22. At the oral argument of counsel mentioned earlier, plaintiff's counsel cited Consolidated Diesel Elec. Corp., 67–2 BCA ¶ 6669 on this point.

terpretation been valid. Furthermore, the force of an explosion, whether it is conventional or nuclear, is not very precise nor predictable. It was therefore not reasonable to expect a bidder who was not privy to the Government's plans, to know that the Government expected this shock absorbing material to be manufactured in place and under these circumstances to a zero tolerance.

Defendant argues that, if the values set forth in the specifications are interpreted as minimums, the "sky" would be the limit. That is not realistic. The evidence indicates that the cost of polyurethane foam increases with an increase in the values set forth in section 5–03. A contractor would therefore be persuaded by sound economic considerations to adhere as closely as possible to those values, read as minimums.

It is also argued that plaintiff's work was of poor quality, providing an independent reason for its rejection. But this argument ignores the fact that the contract was abruptly terminated, while the contractor was being asked to meet an interpretation which was impossible, and when it was undergoing the normal "start up" or "learning curve" difficulties inherent in every project. There is no evidence that plaintiff could not have thereafter performed in accordance with its interpretation of the specifications, had it been afforded an opportunity to do so.

All of the foregoing considered, plaintiff is entitled to recover.

## CONCLUSION

Plaintiff's motion for summary judgment is granted and defendant's cross-motion is denied and judgment is entered for plaintiff in accordance with the opinion. Further proceedings are stayed pursuant to Rule 167 [prior to September 1, 1969, Rule 100] for a period of ninety (90) days to afford the parties an opportunity to obtain an administrative resolution by the agency of the equitable adjustment to which plaintiff is entitled.[23]

---

23. As required by United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).

The hearing examiner's opinion states that "[p]rior to the hearing the appellants asked that the Contracting Officer audit their books in order that the amount of an equitable adjustment, if any was due, could be determined at the hearing. The Contracting Officer objected to this on the ground that it would be a waste of time and money if it was ultimately found that no adjustment was in order. The examiner agreed with this position and the hearing was limited to the determination of liability."

It is observed that the contracting officer originally terminated this contract for default, converted that to a no-cost suspension, and that the case has since been argued as one involving a constructive change (see note 4 *supra*). It would therefore seem appropriate that an equitable adjustment be negotiated in accordance with the principles relating to changes.