**METRIC CONSTRUCTORS, Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 02–5086.

United States Court of Appeals, Federal Circuit.

Dec. 18, 2002.

David R. Johnson, Vinson & Elkins, L.L.P., of Washington, DC, argued for plaintiff-appellant.

Brian S. Smith, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director; and Harold D. Lester, Jr., Assistant Director.

Before MAYER, Chief Judge, FRIEDMAN, Senior Circuit Judge, and BRYSON, Circuit Judge.

BRYSON, Circuit Judge.

Metric Constructors, Inc., entered into a contract with the National Aeronautics and Space Administration ("NASA") to build the Space Station Processing Facility ("SSPF") at the Kennedy Space Center in Florida. Meisner Electric, Inc., performed electrical work on the project under a subcontract from Metric. After its work on the contract was completed, Meisner filed claims through Metric against the government, requesting an equitable adjustment in the contract price. The contracting officer denied the request, and Metric filed this action in the United States Court of Federal Claims.

The government argued that a July 1996 document executed by Meisner had the effect of releasing Metric and the government from all further liability on the contract, and that Metric's action in the Court of Federal Claims therefore had to be dismissed. The court agreed and held that the July 1996 document constituted a full release of Metric and the government and therefore foreclosed any further claims on the contract by Metric on Meisner's behalf. Metric appealed.

This case, like many contract disputes, turns on the interpretation of a document—the "July 1996 release"—that was poorly drafted and thus left the parties in a state of legitimate disagreement as to its meaning. While we sympathize with the trial court's effort to make sense of a document that is difficult to interpret, we conclude that the document did not have the legal effect of releasing the government from any further claims asserted by Meisner through the prime contractor, Metric. We therefore reverse the summary judgment in favor of the government

and remand the case for further proceedings before the Court of Federal Claims.

## I

The pivotal question in this case is whether the July 1996 release that Meisner issued to Metric released Metric from any further liability on its subcontract with Meisner and thus extinguished Metric's right to pursue a claim against the government on Meisner's behalf. To resolve that question requires a review of the background of the release as well as an examination of the precise language used in the disputed document.

NASA entered into the contract with Metric to build the SSPF in early 1991. Shortly thereafter, Metric entered into a subcontract with Meisner to do the electrical work in the facility, for a price of $8,635,000.

Work under the electrical subcontract did not proceed smoothly. There were many changes to the contract, which increased the subcontract price to more than $11,500,000. When the work was completed, Meisner contended that a total of $106,519 remained to be paid on the subcontract, not counting requests for equitable adjustment. However, in part because of a dispute between Meisner and another subcontractor, Metric advised Meisner that it could not make any further payments to Meisner at that time. Metric added that it would be making settlement offers to Meisner on all the extra work orders and would adjust Meisner's subcontract accordingly.

In March 1995, Metric forwarded a subcontract change order to Meisner that increased the revised amount of the subcontract and, according to Metric, resolved "all of Meisner's extra work over invoices on this project" with the exception of one small invoice. Several months later, Meisner sought Metric's aid in requesting an equitable adjustment from NASA relating to "costs and schedule impacts" throughout the performance of the subcontract.

On April 17, 1996, Metric and NASA reached a settlement on an equitable adjustment claim related to Meisner's work on the contract for the SSPF substation 1 transformer. NASA agreed to pay $39,000 to resolve the claim, and Metric agreed to pay $36,000 of that amount to Meisner. Nine days later, Metric and Meisner entered into an agreement, termed the "Liquidation Agreement," which referred to Meisner's claims for additional compensation under its subcontract based on "actions and inactions by NASA." The agreement sought to "establish the procedure for adjudication of [Meisner's claims] and for establishing and releasing [Metric's and Meisner's] respective liabilities" as to those claims. Metric agreed to pay Meisner $74,751 that Metric had withheld based on the dispute between Meisner and another subcontractor. In addition, Metric agreed to present Meisner's claims to NASA and assist in prosecuting those claims, subject to Metric being permitted to retain an agreed-upon portion of any recovery for itself, as general contractor.

On the same day that the Liquidation Agreement was signed, Meisner issued to Metric a form document entitled "Affidavit and Release" and subtitled "Partial Payment." The document invoiced the payment of the $74,751 by Metric to Meisner and granted Metric a release. The release recited that Meisner warranted that all labor, materials, and other expenses related to the subcontract had been paid for, and that Meisner released Metric "and the owners of the project from all claims whatsoever arising out of or relating to the subcontract or purchase order to the extent of payments actually received." The

release also waived any lien rights with respect to the project "to the extent of payments actually received" and agreed to indemnify Metric against "any claim or lien asserted through or under [Meisner] with respect to the project."

In May of 1996, NASA issued a formal change order to Metric in the amount of $39,000 for the substation 1 transformer claim settlement. Consistent with its agreement with Meisner, Metric then passed on $36,000 of that amount to Meisner. In connection with the receipt of that sum, Meisner on July 15, 1996, issued another document similar to the April 1996 release. The July release was identical to the April release in several respects: it was entitled "Affidavit and Release" and subtitled "Partial Payment"; it contained language releasing Metric and the project owner (the government) from "all claims whatsoever arising out of or relating to the subcontract or purchase order to the extent of payments actually received"; it waived any lien rights with respect to the project "to the extent of payments actually received"; and it promised to indemnify Metric against "any claim or lien asserted through or under [Meisner] with respect to the project."

■ A year and a half later, Metric submitted a request for equitable adjustment to NASA on Meisner's behalf, seeking compensation for a variety of direct costs and disruptions to Meisner's performance. The contracting officer denied the request in most respects. Metric then converted the request to a claim, and when the claim was denied Metric filed its complaint as a "pass-through" suit in the Court of Federal Claims. In a pass-through suit, a prime contractor that is liable for damages sustained by its subcontractor may bring claims against the government on behalf of the subcontractor. See E.R. Mitchell Constr. Co. v. Danzig,

175 F.3d 1369, 1370 (Fed.Cir.1999). A pass-through suit is necessary because subcontractors in a government contract are not in privity with the government and may not sue the government directly.

Shortly before Metric filed its equitable adjustment complaint, this court ruled in Metric's favor on a separate appeal from an adverse decision by the Armed Services Board of Contract Appeals. That appeal involved a deduction that NASA had taken from Metric's contract for failing to install new light bulbs throughout the SSPF upon completion of the electrical subcontract. This court held that the contract did not require Meisner to do that work. See Metric Constructors, Inc. v. NASA, 169 F.3d 747 (Fed.Cir.1999). As a result, NASA issued a change order in August 1999 increasing the contract price by $171,084, and Meisner received payment in that amount from Metric.

Before that appeal was decided, the government moved for summary judgment in the present action on the ground that the July 1996 release discharged Metric and the government from any further liability on the subcontract. The government argued that because the release completely absolved Metric of further liability to Meisner, the claims for equitable adjustment that Metric had brought on Meisner's behalf were barred under the Severin doctrine, which provides that if a subcontractor in a government contract has released the general contractor from any liability on a claim, the general contractor cannot pursue that claim against the government. See Severin v. United States, 99 Ct.Cl. 435 (1943).

The trial court agreed with the government's argument, granted summary judgment, and dismissed the complaint. The court construed the July 1996 release as a full release of Metric and the government "from liability for all claims arising under

the subcontract because the July 1996 payment constituted final payment of the subcontract balance." The language of the July 1996 release, the court concluded, was unambiguous. The court ruled that the release constituted "an iron-bound release of both Metric and the Government," and for that reason, the court held, Metric could not pursue the claims for equitable adjustment on Meisner's behalf.

## II

■ The parties agree that the *Severin* doctrine bars Metric's pass-through suit only if the government satisfies its burden of showing that Meisner's July 1996 release granted Metric or the government a full release from all further obligations under the electrical subcontract, including any obligations relating to potential claims for equitable adjustment. *See E.R. Mitchell Constr. Co. v. Danzig,* 175 F.3d at 1371; *Owens–Corning Fiberglas Corp. v. United States,* 190 Ct.Cl. 211, 419 F.2d 439, 456–58 (1969). The parties do not dispute that the doctrine applies to the equitable adjustment claims at issue in this case. We therefore must resolve whether the July 1996 release covers all of Meisner's potential claims under its subcontract or is less comprehensive.

Metric argues that Meisner's July 1996 release did not effect a complete release of Metric or the government, but instead merely released any claim related to the substation 1 transformer claim. Metric argues that the surrounding circumstances make clear that the July 1996 release was intended to be only a partial release, not a complete release of all claims related to Meisner's subcontract on the SSPF project. Metric focuses on the Liquidation Agreement, in which the parties agreed that Metric would submit claims for equitable adjustment on Meisner's part, and on Metric's 1999 payment of $171,084 to

Meisner for the light bulb claim. The government counters by contending that the language of the July 1996 release is unambiguous and that the trial court properly declined to consider extrinsic evidence to determine its meaning.

We disagree with the government and the trial court that the July 1996 release is unambiguous and that it can only be interpreted as an "iron-clad" release of all claims relating to the SSPF electrical subcontract. First, the release is denominated a "partial payment" affidavit and release. While that point is not dispositive, it suggests that the generic release form was intended to be applicable to partial payments generally, and not to be limited to final payments on a contract. Second, the release language qualifies the extent of the release. It provides that the company and the owner are released from all claims arising out of or relating to the contract "to the extent of payments actually received." The meaning of that qualifying language is admittedly somewhat unclear, but if the release were intended to be unqualified, there would be no need for any such language of qualification. The government's proffered explanation for that language—that it is intended to protect against effecting a release until payment is received—is not persuasive.

Some light is shed on the meaning of the "to the extent" clause by the Florida statute that governs construction liens. *See* Fla. Stat. Ann. § 713.06. That statute provides that "[w]hen any payment becomes due to the contractor on the direct contract, *except the final payment,*" and the payment is not sufficient to pay the bills of all lienors, the lienors shall be paid pro rata, and lienors receiving money "shall execute partial releases . . . *to the extent of the payment received." Id.* § 713.06(3)(c)(2) (emphasis added). That is, the statute provides that, in the event a

progress payment is not sufficient to pay all the lienors' claims for the work covered by the partial payment, the lienors are to execute partial releases to the extent of the payments made to them. Under the statute, such partial releases are not used in connection with the final payment under a contract, for which an entirely different procedure is dictated. *See id.* § 713.06(3)(d).

The July 1996 release used the qualifying language "to the extent of payments actually received" not only in the release clause, but also in the clause providing for the waiver of lien rights. That clause of the release provided that the subcontractor "waives any lien rights with respect to the project to the extent of payments actually received." In light of the Florida lien statute, it thus appears that the form used for the July 1996 release was designed for partial payments on a contract that did not constitute the final payment, and that both the claim release clause and the lien release clause were intended to do no more than release the prime contractor (and the owner) from any claims or liens relating to the payments received. That falls far short of releasing the prime contractor or the owner from any further liability under the contract altogether.

For the reasons set forth above, we are persuaded that the language of the July 1996 release is sufficiently ambiguous to allow consideration of the circumstances surrounding the release to determine its meaning. Our examination of those circumstances persuades us that the government failed to satisfy its burden of showing that Meisner intended to release Metric and the government from any further liability under the electrical subcontract.

We reach this conclusion for several reasons. First, the evidence shows that the $36,000 payment that was referred to in the July 1996 release was based on the settlement of the substation 1 transformer claim, which occurred on April 17, 1996. Under that settlement, NASA and Metric agreed that NASA would pay Metric $39,000 and that Metric would pay $36,000 of that sum to Meisner. When Metric and Meisner entered into the Liquidation Agreement eight days later, the transformer claim had already been settled and the sum due to Meisner was not in dispute. The substation transformer claim therefore was not among the claims that Metric agreed to help Meisner pursue against NASA under the Liquidation Agreement. For that reason, we are not convinced that the $36,000 payment associated with the July 1996 release constituted all of Meisner's anticipated claims under the April 1996 Liquidation Agreement. Instead, it is more consistent with the parties' conduct to treat the July 1996 release as a waiver of liens and a release with respect to the substation transformer settlement, a subject distinct from the claims contemplated in the Liquidation Agreement.

Second, the terms of the Liquidation Agreement support Metric's argument that the July 1996 release was not intended as a release of Meisner's equitable adjustment claims. Part of the purpose of the Liquidation Agreement was to confirm that Metric would pay the $74,751 it owed Meisner after the resolution of the dispute between Meisner and another subcontractor. A separate purpose of the Liquidation Agreement was to ensure that Metric would assist Meisner in prosecuting further claims against NASA. Plainly, then, both Metric and Meisner anticipated that successful pursuit of those claims would result in subsequent payments to Meisner. Therefore, the $74,751 payment was not envisioned as the final payment that would be made to Meisner. Yet the April 1996 release that Meisner issued on

the same day that the Liquidation Agreement was signed was identical in form to the July 1996 release. It contained the same broad language that the government relies on in the July 1996 release (a release "from all claims whatsoever arising out of or relating to the subcontract"), and it contained the same qualifying language that Metric relies on ("to the extent of payments actually received"). Given that a virtually identical release issued in April 1996 was clearly not intended to release Metric and the government from any further liability on the subcontract, it is unlikely that the July 1996 release was intended to have that very effect.

Third, despite executing the July 1996 release, Metric made a substantial payment on the light bulb claim to Meisner under the subcontract after the date of the release. The government characterizes that payment as a voluntary transfer unsupported by any legal obligation. However, the fact that Metric and Meisner behaved as if Metric had continuing obligations to Meisner under the subcontract after July 1996 is strong evidence that the parties to the release did not regard it as an iron-bound release of Metric and the government from all further liability in connection with the subcontract.

Finally, as noted earlier, the language of the two release forms appears to be based on Florida lien statutes governing payments to a contractor on a construction project. *See* Fla. Stat. Ann. § 713.06. Significantly, the language in question ("to the extent of payments actually received") is based on a statute that governs payments other than the final payment to the contractor. *See id.* The statutory provision that governs final payments contains no such language. *See id.* § 713.06(3)(d). It is therefore fair to infer that Meisner chose a form that was designed, albeit somewhat clumsily, to conform to Florida

law provisions governing non-final payments on a subcontract, and that it therefore did not intend for the July 1996 release to serve as a complete release of all continuing obligations under the subcontract.

In sum, having determined that the July 1996 release did not unambiguously release Metric and the government from any further liability stemming from Meisner's performance of its subcontract, we conclude that the government did not meet its burden of establishing that Meisner executed an iron-clad release sufficient to trigger application of the *Severin* doctrine. Accordingly, we reverse the summary judgment in favor of the government and remand the case to the trial court for further proceedings.

*REVERSED and REMANDED.*