# United States Court of Appeals for the Federal Circuit

2008-5087

BELL BCI COMPANY,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Richard O'Shea Wolf, Moore & Lee, LLP, of McLean, Virginia, argued for plaintiff-appellee. With him on the brief was Charlie C.H. Lee.

Brian M. Simkin, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. On the brief were Jeanne E. Davidson, Director, and Joan Stentiford Swyers, Trial Attorney. Of counsel was Kyle E. Chadwick, Senior Trial Attorney.

Appealed from: United States Court of Federal Claims

Judge Thomas C. Wheeler

# United States Court of Appeals for the Federal Circuit

2008-5087

BELL BCI COMPANY,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Appeal from the United States Court of Federal Claims in 03-CV-1613, Judge Thomas C. Wheeler.

_____

DECIDED:  June 25, 2009

_____

Before NEWMAN, RADER, and PROST, Circuit Judges.

Opinion for the court filed by Circuit Judge PROST.  Dissenting opinion filed by Circuit Judge NEWMAN.

PROST, Circuit Judge.

Bell BCI Company ("Bell") and the National Institutes of Health ("NIH") entered into Contract No. 263-98-C-0102 on March 26, 1998.  The fixed-price contract originally required Bell to construct a new five-story laboratory building by June 29, 2000.  After several significant changes to the contract, Bell substantially completed a six-story laboratory building on February 8, 2002.  After the government denied Bell's claim for equitable adjustment, Bell sued the government for breach of contract and requested that the United States Court of Federal Claims review several of the contracting officer's ("CO's") decisions.  The court ultimately found for Bell in all regards.  Bell BCI Co. v.

<u>United States</u>, 81 Fed. Cl. 617 (2008).  The government now appeals the decision in its entirety.  For the reasons set forth below, we affirm-in-part, vacate-in-part, and remand.

BACKGROUND

In 1998, the government decided to construct a new building on the NIH campus in Bethesda, Maryland.  The government awarded the contract to Bell, even though Bell was not the lowest bidder.  The contract included language from the Federal Acquisition Regulations ("FAR"), 48 C.F.R. § 52.243-4(d), which expressly allows for equitable adjustment:

> If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing.

Bell was to complete the five-story building by June 29, 2000.  It began construction on April 1, 1998, and proceeded on schedule until December 1998.  At that time, the government realized it had a budget surplus and decided to add another floor (a "new" fourth floor) to the building.  To govern the contractual changes, the parties entered into Modification 93 ("Mod 93") on October 2, 2000.  Mod 93 included a price increase to pay for the new floor, and gave a revised project completion date.  Bell agreed to meet fourteen "substantial completion" milestones during the construction period, and the parties agreed upon liquidated damages of $266 per day of delay. Paragraph 4 of Mod 93 says that the modification will

> increase the contract amount by $2,296,963 . . . as full and equitable adjustment for the remaining direct and indirect costs of the Floor 4 Fit-out (EWO 240-R1) and full and equitable adjustment for all delays resulting from any and all Government changes transmitted to the Contractor on or before August 31, 2000.

Paragraph 8 of Mod 93 reads:

> The modification agreed to herein is a fair and equitable adjustment for the Contractor's direct and indirect costs. This modification provides full compensation for the changed work, including both Contract cost and Contract time. The Contractor hereby releases the Government from any and all liability under the Contract for further equitable adjustment attributable to the Modification.

The language in paragraph 8 was repeated in a number of subsequent modifications.

After the parties adopted Mod 93, Mr. Temme (who worked for NIH's construction quality manager) and Mr. Kutlak (the CO's technical representative) informed NIH personnel that NIH should refrain from making additional changes to the project. Bell BCI, 81 Fed. Cl. at 623. Nonetheless, the government issued 113 additional modifications, which incorporated 216 Extra Work Orders ("EWOs"). An additional fifty-eight issued EWOs were never incorporated into any modification. Bell ultimately missed thirteen of the fourteen milestone dates set forth in Mod 93. Shortly after Bell completed construction, it submitted a Request for Equitable Adjustment to the CO. The CO denied the claim, and instead asserted claims against Bell for liquidated damages, credits due the government, the cost of retests, and estimated costs for "outstanding major deficiencies." Id. at 624.

At that point, Bell filed suit in the Court of Federal Claims. Both parties filed cross-motions for summary judgment, which the court denied. Bell BCI Co. v. United States, 72 Fed. Cl. 164, 170 (2006). The court granted the government's motion to dismiss Bell's promissory estoppel claim. Id. at 167–68. After trial, the court found in favor of Bell. Bell BCI, 81 Fed. Cl. at 617. In total, the court awarded Bell $6,200,672, which breaks down as follows: (1) $2,058,456 in labor inefficiency costs attributable to the cumulative impact of the changes; (2) $1,602,053 for the delays of remaining on the

project after April 30, 2001; (3) $366,051 as a 10% profit on the delay and labor inefficiency costs; (4) $563,125 as the unpaid balance of the contract price; and (5) $1,610,987 for unresolved changes covered by the fifty-eight EWOs not incorporated into any modification. Id. at 619. The court also rejected NIH's claim to liquidated damages, id. at 640, and sustained subcontractor Stromberg Metal's cumulative impact claim, id. at 641. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

The trial court's findings of fact are reviewed under the "clearly erroneous" standard, while its legal holdings are reviewed de novo. Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1292 (Fed. Cir. 2002). Credibility and intent determinations are questions of fact. Comm. Contractors, Inc. v. United States, 154 F.3d 1357, 1369 (Fed. Cir. 1998); Dureiko v. United States, 209 F.3d 1345, 1356 (Fed. Cir. 2000). Contract interpretation is a question of law. Lucent Techs., Inc. v. Gateway, Inc., 543 F.3d 710, 717 (Fed. Cir. 2008).

Different standards of review are applicable to different aspects of a damages award. "[T]he clear error standard governs a trial court's findings about the general type of damages to be awarded (e.g., lost profits), their appropriateness (e.g., foreseeability), and rates used to calculate them (e.g., discount rate, reasonable royalty). The abuse of discretion standard applies to decisions about methodology for calculating rates and amounts." Home Sav. of Am. v. United States, 399 F.3d 1341, 1347 (Fed. Cir. 2005). The evidentiary basis for a court's ruling on damages need only be "sufficient to enable a court or jury to make a fair and reasonable approximation," and as long as a party can

clearly establish a reasonable probability of damage, "uncertainty as to the amount will not preclude recovery." Seaboard Lumber, 308 F.3d at 1302 (quoting Specialty Assembling & Packing Co. v. United States, 355 F.2d 554, 572 (Ct. Cl. 1966) and Ace-Fed. Reporters, Inc. v. Barram, 226 F.3d 1329, 1333 (Fed. Cir. 2000) (quotation marks omitted)).

## A. Cumulative Impact

The first issue on appeal is whether the release language in paragraph 8 of Mod 93, repeated in later modifications, covers Bell's cumulative impact claims. Paragraph 8 says that the modification "provides full compensation for the changed work" and that Bell "hereby releases the Government from any and all liability under this Contract for further equitable adjustment attributable to the Modification."

In finding for Bell, the Court of Federal Claims drew a distinction between a "delay" claim and a "disruption" or "cumulative impact" claim. The court stated that "[a]lthough the two claim types often arise together in the same project, a 'delay' claim captures the time and cost of not being able to work, while a 'disruption' claim captures the cost of working less efficiently than planned." Bell BCI, 72 Fed. Cl. at 168. The court repeatedly stated that the release did not address cumulative impact or disruption claims, but failed to articulate why this was the case. See, e.g., Bell BCI, 81 Fed. Cl. at 619, 623, 629–30, 639. The court then looked to the contract's "Changes" clause, excerpted above as FAR 52.243-4, and determined that "[u]nless provided otherwise, the bilateral modifications will compensate the contractor for performing the changed work, but not for the impact of multiple change orders on the unchanged work." Id. at

637. Because in the court's view Mod 93 did not "provide otherwise," the court concluded that Bell did not release its cumulative impact claims.

We do not question the court's finding that, in light of the numerous changes to the contract, Bell suffered a cumulative impact. But the issue is not whether Bell suffered a cumulative impact—it is whether Bell released the government from liability for that impact.

The government argues that Bell's cumulative impact claims, if they exist, are barred by accord and satisfaction. Accord and satisfaction occur "when some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim." Cmty. Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1581 (Fed. Cir. 1993). To prove accord and satisfaction, the government must show "(1) proper subject matter; (2) competent parties; (3) a meeting of the minds of the parties; and (4) consideration." O'Connor v. United States, 308 F.3d 1233, 1240 (Fed. Cir. 2002). In this case, no dispute exists regarding proper subject matter or the competence of the parties. The Court of Federal Claims, however, found that Bell and the government never had any meeting of the minds, and that the government did not provide consideration for Bell's release. Bell BCI, 81 Fed. Cl. at 639. The court felt that "prudent contracting parties surely would be specific in describing the exact scope of any release or reservation of rights." Id. Finally, the court stated that "[t]o the extent ambiguity exists in Modification 093 or in the modifications collectively, NIH as the drafter of these documents 'must bear the risk of any contractual uncertainty, ambiguity or inequitable consequence.'" Id.

at 639–40 (quoting <u>Flatstone Tire & Rubber Co. v. United States</u>, 444 F.2d 547, 551 (Ct. Cl. 1971)).

The government argues that the more than $2,000,000 described in paragraph 4 of Mod 93 was "full compensation for the changed work"—in other words, that amount was paid as consideration for Bell's release. The government also claims that because the release language is not ambiguous, parol evidence cannot be considered. To the extent extrinsic evidence is permitted, however, the government points to evidence indicating Bell "knew of the possibility of a cumulative impact claim and also knew how to reserve it," but "Bell simply failed to do so."

Because a release is contractual in nature, it is interpreted in the same manner as any other contract term or provision. <u>See</u> <u>Metric Constructors, Inc. v. United States</u>, 314 F.3d 578, 579 (Fed. Cir. 2002) ("This case, like many contract disputes, turns on the interpretation of [the release] . . . ."); Restatement (Second) of Contracts § 284 cmt. c (1981) ("The rules of interpretation that apply to contracts generally apply also to writings that purport to be releases."). To resolve the debate, then, we must first determine whether the release language in Mod 93 is unambiguous. Only in the event of an ambiguity may we examine extrinsic or parol evidence. <u>McAbee Constr., Inc. v. United States</u>, 97 F.3d 1431, 1434 (Fed. Cir. 1996). We look to the plain language of the release, as "if the 'provisions are clear and unambiguous, they must be given their plain and ordinary meaning.'" <u>Id.</u> at 1435 (quoting <u>Alaska Lumber & Pulp Co. v. Madigan</u>, 2 F.3d 389, 392 (Fed. Cir. 1993)); <u>see</u> <u>Barron Bancshares, Inc. v. United States</u>, 366 F.3d 1360, 1375–76 (Fed. Cir. 2004).

We hold that the language in paragraph 8 of Mod 93 is unambiguous, and the court clearly erred in holding that Bell did not release its cumulative impact claims attributable to that modification. The language plainly states that Bell released the government from <u>any and all</u> liability for equitable adjustments attributable to Mod 93. At best, there may be ambiguity as to which claims are "attributable to" a given modification, but we cannot glean any ambiguity about which <u>types</u> of claims are released—Mod 93 clearly, unambiguously releases the government from "any and all" liability. As the Supreme Court stated in <u>United States v. William Cramp & Sons Ship & Engine Building Co.</u>, "[i]f parties intend to leave some things open and unsettled, their intent so to do should be made manifest." 206 U.S. 118, 128 (1907). Further, the government's payment of over $2,000,000 in Mod 93 constitutes adequate consideration for Bell's release.[1] <u>See</u> Restatement (Second) of Contracts § 79 cmt. c (1981); <u>see also</u> <u>Aviation Contractor Employees, Inc. v. United States</u>, 945 F.2d 1568, 1573–74 (Fed. Cir. 1991).

In the absence of an ambiguity, we decline to examine the parties' extrinsic evidence. We therefore remand to the Court of Federal Claims so it can determine which of Bell's cumulative impact claims, if any, are "attributable to" modifications <u>other than</u> those modifications that contain the release language discussed above.

### B. Delay and 10% Profits

For the same reason, we take issue with the Court of Federal Claims's decision to award $1,602,053 for the delays of remaining on the project after April 30, 2001. The

---

[1]    We leave it to the district court on remand to determine whether the government provided adequate consideration for other modifications containing the release language discussed herein.

court arrived at its April 30, 2001 date because Bell originally was to complete construction by June 29, 2000, and Bell received extensions from NIH accounting for 304 days (making the new contract completion date April 30, 2001). Bell did not finish construction until February 8, 2002, however, and the 284 days between April 30, 2001 and February 8, 2002 are at issue in Bell's "delay" claim.

Again, we defer to the trial court's finding that "evidence of excusable delay from changed work" was "so overwhelming that a reasonable person could not reach a contrary result." Bell BCI, 81 Fed. Cl. at 640. We also defer to the court's determination that the government's expert, who concluded that NIH caused just thirty-two days of delay on the project, was "simply . . . not credible." Id. But this does not end our inquiry, since as before the question is whether the release language present in Mod 93 and later modifications excuses the government from liability for Bell's delay claims. We hold that it does. As explained above, the language of the release is unambiguous—Bell released the government from "any and all" liability, which plainly includes the government's liability for delays. On remand, the Court of Federal Claims must determine which delays, if any, are attributable to modifications that do not include the release language identified in paragraph 8 of Mod 93.

As a result, we must also vacate the trial court's award of 10% profits on the delay and cumulative impact claims. Once the court determines which specific delays or cumulative impacts are not "attributable to" modifications containing the release language, the court is free to award appropriate profits on those amounts.

### C. Other Arguments

The government raises challenges to other aspects of the trial court's decision,

including the court's methodology for calculating delays and damages, the court's award to Bell for the balance of the contract price and the fifty-eight EWOs not incorporated into any modification, the court's award to subcontractor Stromberg Metal, and the court's decision to deny the government any liquidated damages. As to these arguments, we affirm the decisions of the Court of Federal Claims. We discern no clear error in the court's judgment as to the type of damages to be awarded, their appropriateness, or the rates used to calculate them. Nor did the court abuse its discretion in adopting Bell's expert's methodology in determining the amount of delay or the damages due to Bell. The same is true for the court's decision-making process with regard to Stromberg Metal. Further, the court's decisions to award Bell the amount due under the contract and for the fifty-eight "disputed" EWOs are not clearly erroneous. Finally, the court's decision to deny the government's liquidated damages claim is appropriate given the court's finding that NIH asserted the claim "only upon the advice of counsel to create negotiating leverage in the event Bell filed a claim against NIH," and was in fact responsible for many of the delays. Bell BCI, 81 Fed. Cl. at 640.

CONCLUSION

For the reasons set forth above, we affirm-in-part, vacate-in-part, and remand to the Court of Federal Claims for proceedings consistent with this opinion.

AFFIRMED–IN-PART, VACATED-IN-PART, AND REMANDED

COSTS

Each party shall bear its own costs.

# United States Court of Appeals for the Federal Circuit

2008-5087

BELL BCI COMPANY,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Appeal from the United States Court of Federal Claims in 03-CV-1613, Judge Thomas C. Wheeler.

NEWMAN, <u>Circuit Judge</u>, dissenting.

This case is a compelling illustration of why appellate tribunals should give due weight to the attributes and benefits of the processes of trial, for such processes enable the trial judge to dig deeply into the events, to figure out what happened and what was intended, and to reach a just result. This is no less important in contract cases than in any other area of law, and no less important when the government is a party, for today government business affects a significant portion of the nation's commerce.

The case at bar concerns a contract for the construction of a building on the campus of the National Institutes of Health (NIH), for which the government retained the Bell BCI Company, an experienced contractor. The building contains office and laboratory space for many special purposes, including culture rooms, isotope labs, cold rooms, warm rooms,

darkrooms, and other individual requirements of the scientist occupants. The issues in dispute arose because a large number of modifications in the building design continued to be made while the construction was proceeding, sometimes requiring demolition of completed work.

Despite the disruptions that are the subject of this litigation, the government's Office of Research Facilities Development and Operations described the building as "a shining star on the NIH campus as it represents the latest in laboratory planning and engineering, and has been highly recognized for its energy saving features." The government's Project Officer Mr. Frank Kutlak testified at trial that the finished product is "the most outstanding building on the NIH campus," an "excellent building" and "quite an accomplishment for everybody involved." Tr. 1229:16-18; 1230:4. But the path to that result was rocky, due to the addition of an entire floor after construction was underway, and an unusual number of design changes throughout the construction.

Witnesses explained at trial that the cumulative effect of the design changes grew as the number of changes grew, including many modifications and Extra Work Orders after it was understood that there would be no further changes. The Court of Federal Claims received extensive testimony about how this contract was implemented by the government and by Bell, and the burgeoning degrees of disruption caused by the government's continuing changes, accompanied by inflexible deadlines and government pressures for progressive occupancy of the building while under construction. The claims here at issue relate solely to the costs due to the cumulative impact of the extensive changes and ensuing difficulties and delays.

My colleagues on this panel, ignoring the trial court's unchallenged findings of

contractual intent and mutual understanding as modifications were agreed, make their own findings and hold that "the release language present in Mod 93 and later modifications excuses the government from liability for Bell's delay claims." However, Mod 93 was followed by 279 additional Extra Work Orders and 113 additional formal Modifications. The Court of Federal Claims found that the parties intended that the releases pertained to the specific modifications, but did not release all possible liability due to the cumulative impact of subsequent changes. From this court's reversal of the trial court's ruling, I respectfully dissent.

DISCUSSION

The Court of Federal Claims found, after a six-day trial with fact and expert witnesses on each side, that the many changes during the construction had a cumulative impact of disruption, delay, and labor inefficiency. These findings have not been challenged. The court found that the government did not prove its defense of accord and satisfaction, and indeed that the government "did not offer any testimony at trial in support of its accord and satisfaction defense." Bell v. United States, 81 Fed. Cl. 617, 639 (2008). The trial court found that the parties did not intend to release all possible future claims for cumulative impact of the many changes, finding that there was no discussion or expectation that such future claims might arise. My colleagues do not assign error to these findings; they simply ignore them.

The release terms on which my colleagues rely are in paragraphs 4 and 8 of Mod 93:

> 4. Increase the contract amount by $2,296,963 ($4,100,000 - $1,803,037 from Mod 77) as full and equitable adjustment for the remaining direct and indirect costs of the Floor 4 Fit-out (EWO 240-R1) and full and equitable

adjustment for all delays resulting from any and all Government changes transmitted to the Contractor on or before August 31, 2000.

8. The modification agreed to herein is a fair and equitable adjustment for the Contractor's direct and indirect costs. This modification provides full compensation for the changed work, including both Contract cost and contract time. The Contractor hereby releases the Government from any and all liability under the Contract for further equitable adjustment attributable to the Modification.

My colleagues, disagreeing with the trial judge, hold that the release provision in Mod 93 is "unambiguous," and fault the Court of Federal Claims for its recourse to evidence of contractual intent and concerning the meaning of "attributable to the Modification" in paragraph 8. However, the evidence was undisputed, and is indisputably contrary to my colleagues' findings.

Mod 93 was executed on October 2, 2000. On October 9, 2000 the government's Project Officer Mr. Kutlak, and Mr. Brian Temme of the firm that had been retained by the government as construction quality manager, wrote jointly to NIH's architectural design contractor HLM Design that Mod 93 "does not incorporate changes after August 31, 2000, and it is therefore incumbent on the Government's team to minimize change." Mr. Temme testified: "Frank [Kutlak] had said something [to Bell] to the effect that there will only be a few more changes," and that he told Bell "on behalf of Jacobs and the government . . . it is incumbent on the government to stop making changes to Bell's contract."

Mr. Kutlak testified: "We had discussions that we basically said we would try our best to limit the changes," and "We had said previously we were going to limit the changes." Mr. Temme testified that he was "concerned that changes issued after August 31, 2000, would impact those interim milestone dates set forth in Mod 93." Both witnesses testified that they were concerned with the many and continuing changes to the building construction

and the resulting impact on Bell's mandated interim and final deadlines. They wrote to HLM Design on Oct. 9, 2000:

> Since we are pushing Bell to maintain schedules, there can be no more changes. [Mr. Kutlak] urged managers to discourage changes within their sections . . . [and Mr. Kutlak] noted the continuing concern about change orders. At this late date in the construction, NIH has little leverage on the contractor to get them done inexpensively and timely.

The requests for restraint were conspicuously ignored throughout the project. As the report by the Office of Research Facilities Development Operations, Division of Property Management stated, there were many "major, wholesale changes which could not be accommodated so late in design." A Report on the Resolution of Operational Issues and Lessons Learned 14 (Jul. 2004).

This Report, which documents extensive "lessons learned", is consistent with the trial court's findings. The trial court found that Mod 93 was intended to end the period of work changes, for construction was well underway, yet thereafter "there were 279 Extra Work Orders and 113 contract Modifications issued after August 30, 2000, while NIH project personnel were maintaining that no further changes would be issued." Bell, 81 Fed. Cl. at 638. Of the 279 Extra Work Orders, 216 were included in the 113 further Modifications; the government refused to pay for the other 58 Extra Work Orders, although Bell had done the requested work. About 47 of the Modifications included the same release language as in Mod 93; thereafter Bell expressly reserved rights for compensation for additional costs and delay when, as the trial court found, it became apparent that the government had "lost control" of the project. Bell, 81 Fed. Cl. at 619.

Bell's witness Mr. Jeremy Bardin testified that release from a possible claim for cumulative impact "was never known or even considered at the time" of contracting or at

the time of entering into Mod 93, which was directed to building the additional floor. He testified that the language in Mod 93 says "Just what it says: Attributed to the impact of the change orders in that modification, which would be the direct cost of work, the cost of materials, subcontract cost, cost of their G&A." Tr. 488: 5-8, 11-12. The Court of Federal Claims found Bell's witnesses credible, and found that the parties did not foresee and did not bargain to release all future possible cumulative impact claims that might arise if many more changes were required. The trial court found that it is undisputed that "[m]any of the events relevant to the cumulative impact claim did not even arise until after the parties signed Modification 093." Bell, 81 Fed. Cl. at 639. Nor was it disputed that the phrase "further equitable adjustment attributable to the Modification" in paragraph 8 related to the work that was the subject of Mod 93.

The government offered no opposing evidence, and did not call the Contracting Officer, although she was on the witness list. The government did not dispute Bell's testimony that there was no discussion about releasing future claims based on unforeseen and changed circumstances. Nonetheless, the panel majority holds that the release provision in Mod 93 was an accord and satisfaction covering not only the performance of Mod 93, but the accumulated effect of all future modifications.

This release clause did not produce an "accord and satisfaction" of unforeseen claims arising from unforeseen and unintended events. The releases are all in terms of "further equitable adjustment attributable to the Modification" in which the releases appear, and do not extend to future modifications and future Extra Work Orders. An accord does not arise until there is a dispute. See Acret, Construction Litigation Handbook 2d §23:2 ("To constitute an accord, a compromise must be definite and certain."); Williston on

Contracts §73:27 ("The doctrine of accord and satisfaction provides a method of discharging a contract or cause of action by which the parties may first agree to give and accept something other than that which is due in settlement of the claim or demand of one party against the other, and then perform their agreement[.]"). "A condition precedent to a valid accord and satisfaction is the establishment of a bona fide dispute over liability," Fleming v. Post, 146 F.2d 441, 443 (2d Cir. 1944), and requires a meeting of the minds as to what is being satisfied. S&T Mfg. Co. v. Hillsborough County, Fla., 815 F.2d 676, 678 (Fed. Cir. 1987).

Contractual intent is a question of fact. Dureiko v. United States, 209 F.3d 1345, 1356-57 (Fed. Cir. 2000). No clear error has been suggested in the trial court's finding that it is undisputed that "[m]any of the events relevant to the cumulative impact claim did not even arise until after the parties signed Modification 093," Bell, 81 Fed. Cl. at 639, and the conclusion that the parties did not contemplate and did not release the cumulative impact and inefficiency claims that arose after many additional construction modifications. The rules of contract interpretation fully support the trial court's recourse to contractual intent.

Bell testified that the cumulative impact and inefficiency problems did not arise right away, but burgeoned as changes continued to be required. Contractual intent is viewed in the situation that existed at the time of contracting. The trial court did not err in holding that the release terms in Mod 93 did not bar compensation for future events, for it is not disputed that Bell was told that no more than 4-6 Extra Work Orders should be expected, and that the 279 Extra Work Orders caused cumulative disruption, delay, and inefficiencies. The principles that underlie government contracting preclude the government from taking unfair advantage of changed circumstances during performance. Federal Acquisition

Regulation 52.243-4 was incorporated into the basic contract between Bell BCI and the government:

> If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing.

48 C.F.R. §52.243-4.

My colleagues, finding no error in the trial court's understanding of this contract, instead create a speculative theory that no party argued. Their theory of possible compensation for some later changes was not presented by either party, either at trial or on this appeal, and is of questionable validity, for cumulative impact requires recourse to the contributions that accumulated.

The findings and rulings of the Court of Federal Claims are fully supported by the evidence and the law, and should be affirmed.